IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-484

 Filed: 19 March 2019

Wake County, No. 08 CVD 14141

APRIL J. HUML, Plaintiff,

 v.

KEVIN C. HUML, Defendant.

 Appeal by defendant from order entered on or about 20 November 2017 by

Judge Lori Christian in District Court, Wake County. Heard in the Court of Appeals

31 October 2018.

 Marshall & Taylor, PLLC, by Travis R. Taylor, for plaintiff-appellee.

 Schiller & Schiller, PLLC, by Jaime L. Williams, for defendant-appellant.

 STROUD, Judge.

 Defendant-father appeals from a permanent custody order which grants sole

custody of the parties’ daughter to plaintiff-mother and eliminates his visitation

privileges. The trial court made extensive findings of fact regarding the many

reasons it determined in its discretion that continuing visitation is not in the child’s

best interest. The order on appeal is the last in a series of orders in which the trial

court used every possible method to help and encourage Father to address his mental

health and domestic violence problems and provided visitation with various

conditions to protect the child. All of these attempts have failed because Father has

consistently refused to take advantage of any opportunity ordered by the trial court
 HUML V. HUML

 Opinion of the Court

to allow Father to resume visitation. Father has repeatedly failed to participate in

counseling as ordered, to take medication as prescribed, to comply with the trial

court’s orders regarding public visitation and with the rules governing supervised

visitation, and to protect the child from exposure to domestic violence in his

relationship with his current wife. We affirm.

 I. Background

 Mother and Father were married in February of 2006 and are the parents of

Susan,1 who was born in September of 2006. The parties separated in 2008 and later

divorced. Since the parties separated in 2008, the trial court entered several orders

regarding custody and visitation. The trial court entered a temporary custody order

in January of 2009, when Susan was two years old. The trial court found that Susan

was having difficulty transitioning between the parties’ homes and noted that Mother

had consulted a child psychologist, but Father had not participated. The trial court

found Father had been “overly emotional” when dropping Susan off at day care,

making it difficult for her to transition. In addition, Susan’s regular pediatrician had

refused to see her because of an incident in the office with Father. Susan had some

significant chronic health problems, so continuity of her medical care was particularly

important. The trial court also found that Father had been “unable to appropriately

control his anger and other emotions” in front of Susan. The temporary order

1 We will use a pseudonym to protect the privacy of the minor child.

 -2-
 HUML V. HUML

 Opinion of the Court

required Father to have a psychological evaluation with Dr. Reid Whiteside and to

comply with any recommendations, including taking medication as prescribed.

 After the psychological evaluation was done, the trial court entered a

permanent custody order by consent on 5 October 2009 which gave Mother and

Father joint legal custody of Susan; Mother had primary physical custody, and Father

had about six overnight visits in every two week period. Father was required to follow

Dr. Whiteside’s recommendations, including treatment with his personal therapist

for at least two years and thereafter unless he was released from therapy. Father

was ordered to continue to take his medication as prescribed and to continue to

participate in family therapy. The consent order also provided for appointment of a

parenting coordinator who was also a psychologist or psychiatrist to monitor any

psychological issues relating to the parties’ co-parenting; Dr. Alan Bloom was

appointed.

 On 31 July 2015, Mother filed a motion to modify custody based upon a

substantial change in circumstances; she alleged, in part, that Father had willfully

ignored the requirements of the consent order; refused to communicate with her;

interfered with her custodial time; failed to provide proper care and supervision of

the child; slept in the same bed with the child on a regular basis; failed to follow

instructions from the child’s physicians and dietician; and that he had been arrested

 -3-
 HUML V. HUML

 Opinion of the Court

for assault on a female on 1 June 2015. Mother also requested appointment of

another parenting coordinator as Dr. Bloom’s term had expired.

 Before the motion for modification was heard, on 4 October 2015, Father’s

girlfriend, whom he later married, Karen Huml, contacted Mother and told her she

“was in fear of” Father. Karen did not want Father to know she had contacted

Mother, and she informed Mother of domestic violence in Father’s home while Susan

was present. On 7 October 2015, Mother filed a motion for emergency custody based

upon the information that Susan had been uncontrollably crying when exposed to

domestic violence in Father’s home. The trial court entered an emergency custody

order and set a return hearing for 12 October 2015. The emergency order limited

Father’s visitation to three hours, two days a week, in a public place such as a

museum or mall, until a return hearing scheduled for 12 October 2015. Mother

subpoenaed Karen for the 12 October 2015 hearing, and both she and Father

requested a continuance, so the return hearing was set for 23 October 2015. On 23

October, Father did not appear for the hearing on time, and the trial court had

resolved the matter before he arrived. The trial court entered a temporary order with

the same visitation as in the emergency order.

 On Thanksgiving night, 2015, Karen again contacted Mother “with photo

attachments and messages that [Father] had injured” her. A few days later, Mother

 -4-
 HUML V. HUML

 Opinion of the Court

asked Father about the incident; he did not deny it, but Karen then said that Father

had not injured her.

 Father continued to bring Karen to his public visits with Susan, despite the

domestic violence between them. On 10 December 2015, Father and Karen got

married, but Mother did not learn of the marriage until she “received an anonymous

email” on Christmas Eve. Mother allowed Susan to go to Father’s home to open gifts

on 26 December 2015. That night, back at her Mother’s home, Susan wet the bed,

although she had not had this problem in several years.

 In January of 2016, Father “‘weaned’ himself off his medication” because he

felt “‘it takes away my life-I’ll take the little ups and downs.’” On 3 April 2016, Father

informed Mother that Karen had texted him “photographs of her forearms sliced up.”

Father called the police, and they discovered Karen was intoxicated. Karen made

claims to the police that Father “was sexually inappropriate while in the presence of”

Susan; she was then placed under a mental commitment. Hearing on Mother’s

pending motion to modify custody was scheduled for the next day, 4 April 2016.

 At calendar call on 4 April 2016, Father informed the trial court he would be

seeking a domestic violence protective order (“DVPO”) against Karen. With the

consent of the parties, the trial court entered a temporary custody consent order; this

order appointed Dr. Cynthia Sortisio as a reunification therapist for Father and

Susan; appointed a new parenting coordinator, Helen O’Shaunessy; and set up a

 -5-
 HUML V. HUML

 Opinion of the Court

three-tiered plan for gradually increasing Father’s visitation. Father was also

required to have another psychological evaluation; to comply with all

recommendations, including any prescribed medication; and to continue attending

and to complete the DOSE domestic violence program.2

 Father did not comply with the temporary custody consent order and never

moved past the first tier of visitation, so his visits continued to be public. Further,

Father did not timely pay the parenting coordinator; failed to engage in any of the

required therapy for over a year; and did not timely complete the parenting classes.

Father also did not obtain a DVPO against Karen, but instead allowed her to

“facetime” with Susan from his car during his public visits. In January 2017, Father

completed the psychological evaluation ordered in April 2016.

 In August of 2016, Mother hired an investigator because she was concerned

that Father was not complying with the terms of the order regarding public visitation.

The investigator confirmed that Father was removing Susan from the public locations

where he was supposed to be visiting with Susan. Mother informed the reunification

therapist and parenting coordinator, who notified Father this was not appropriate.

 On 8 September 2016, Father was arrested again for assault on a female,

against Karen. Karen sent the parenting coordinator voice recordings she claimed

2 DOSE is the acronym for “Developing Opportunities for a Safe Environment,” a domestic violence
intervention and education program.

 -6-
 HUML V. HUML

 Opinion of the Court

were of Father “making threats to kill” Mother. Karen also sent text messages she

claimed were from Father threatening Judge Denning, the judge who entered the

temporary custody consent order. The parenting coordinator informed the police of

the threats, and they advised Mother to leave home and stay at an undisclosed

location, which she and Susan did for about a week. On 21 November 2016, Mother

also got an ex parte DVPO which extended into a permanent DVPO by consent. Judge

Denning recused because of the threats, and a new family court judge was assigned.

Because of safety concerns, neither the parenting coordinator nor Susan’s therapist

would meet with Father alone.

 Because of the DVPO, Father could no longer exercise his public visits, and on

19 May 2017, Father began supervised visitation with Susan at Time Together. After

Susan visited with Father, she “became withdrawn, cried uncontrollably, began to

experience stomach pains, showed signed of anxiety and stress,” to the extent that

she missed school on 22 May 2017. At the June visit at Time Together, staff had to

redirect Father for whispering to Susan. Susan again experienced extreme emotional

distress after this visit. On 15 June 2017, Mother filed a motion to suspend Father’s

visitation.

 The hearing on modification of custody was held on 19 July and 20 July 2017,

and on 17 November of 2017, the trial court entered an “ORDER MODIFYING

PERMANENT CUSTODY AND CHILD SUPPORT ORDER[;]” the order at issue on

 -7-
 HUML V. HUML

 Opinion of the Court

appeal. The trial court made extensive and detailed findings of fact, just a few of

which we have summarized above. The trial court concluded there had been many

substantial changes in circumstances affecting the best interest of Susan; the trial

court found these circumstances and detrimental changes in detail. Regarding

violence the trial court found:

 c. As a result of Defendant’s actions since the entry of
 the prior Permanent Custody Order the Plaintiff is
 terrified of the Defendant and she has good cause to
 be afraid of the Defendant.

 d. Since the entry of the prior Permanent Custody
 Order, at least on four separate occasions the
 Defendant made threatening statements about the
 Plaintiff which included statements regarding a
 murder/suicide, blowing her head wide open,
 snapping her neck and putting a strangle around her
 neck. These statements were laced with profanity
 and made explicit comments about having to take
 DOSE classes for 26 weeks, showing that Defendant
 took no responsibility for his own actions and
 emphasizing that Defendant has anger issues that
 he has never adequately addressed even after
 completing his DOSE classes in 2016.

 ....

 f. Defendant took a deferral plea for Assault on a
 Female related to [Karen] Huml in Wake County file
 no. 15 CR 212182 that was subsequently expunged,
 and as part of that deferral plea the Defendant was
 required to complete a DOSE program. The
 Defendant’s anger and rage as heard by this Court
 in the voice recordings of the Defendant are
 disturbing; and Defendant’s anger issues and
 refusal to appropriately address his anger have had

 -8-
 HUML V. HUML

 Opinion of the Court

 a detrimental impact on not only the minor child to
 not feel safe around the Defendant but the Plaintiff,
 her parents, Plaintiff’s friends, Plaintiff’s co-workers
 and various professionals involved with this family.

 ....

 s. Since the entry of the prior Permanent Custody
 Order, and starting around December 2014,
 Defendant was not transparent or forthcoming
 regarding the well-being of the minor child when she
 was in his care, including, but limited [(sic)] to
 failing to inform the Plaintiff of the domestic
 violence in his home while their child was present,
 misrepresenting his location during public
 visitations, denying that he was still in a
 relationship with [Karen] Huml and such other
 matters set forth in these findings of fact.
 Defendant’s actions related to these issues have had
 a detrimental impact on the minor child.

 t. The Defendant has shown a consistent pattern of
 making poor parenting decisions including those
 referenced in the above findings of fact.

 u. Defendant downplays and ignores the minor child’s
 anxiety and/or stress. Defendant has been angry
 around the minor child and the child has
 experienced significant trauma related to the
 Defendant’s actions.

 v. Since the entry of the prior Permanent Custody
 Order and starting around December 2014
 Defendant has exhibited inconsistent, unstable, and
 erratic behavior while providing care for the minor
 child.

 The trial court also determined that Father “should not have any further

contact with” Susan as a “direct result of his actions and his failure to take steps that

 -9-
 HUML V. HUML

 Opinion of the Court

could have improved his relationship with his daughter.” The trial court also set out

detailed findings regarding why Father should not have any custodial rights or

visitation with Susan:

 a. The April Temporary Order entered in 2016 gave the
 Defendant liberal visitation with the minor child
 and established a three tier visitation schedule.
 Defendant failed to take advantage of this
 opportunity to repair and rehabilitate his
 relationship with his daughter. There was a
 reunification therapist that was available to the
 Defendant for over a full calendar year (April 2016
 to July 2017) and other than two initial phone calls
 in June 2016 and one meeting in July 2017 the
 Defendant did absolutely nothing to work with the
 reunification therapist to improve his relationship
 with his daughter. Defendant first met together with
 the reunification therapist and the minor child’s
 therapist on July 17, 2017 two days before this
 hearing.

 b. The communication that the Defendant did have
 with the child’s therapist was not productive.
 Defendant ignored recommendations that
 Defendant write a letter taking responsibility for
 everything in December 2016 in response to
 Defendant’s attempt to send Christmas
 cards/correspondence to the minor child. In
 December 2016, Dr. Meisburger advised Defendant
 that he would need to send her written
 correspondence via postal mail and await her reply
 the same. After December 2016 until July 2017,
 there was no further contact between Dr.
 Meisburger and Defendant. Defendant failed to
 grasp that the recommendations from the child’s
 therapist were based [on] the needs of the minor
 child. Defendant has continuously put his needs
 above the minor child’s needs without concern for

 - 10 -
 HUML V. HUML

 Opinion of the Court

 the detrimental impact his own actions had on the
 minor child.

c. Even after the DVPO was entered in November 2016
 the Defendant had the ability to reach out to the
 reunification therapist and the child’s therapist to
 maintain a role in [Susan’s] life. Defendant made
 the choice to do nothing.

d. Since July 2016 until his deposition in June 2017,
 Defendant paid no child support to the Plaintiff
 despite having an agreement to make payments to
 her. Defendant made a $400 payment in June 2017.
 Defendant ignored all medical bills, therapy bills,
 and healthcare related items for the minor child
 from July 2016 through the date of this hearing.
 Defendant was not concerned about anyone’s well-
 being but his own.

e. Defendant’s threats against the Plaintiff put the
 Plaintiff in a real fear of her life. Defendant’s threats
 against the Plaintiff resulted in the Plaintiff and
 minor child having to go in hiding at hotels for a
 period of time. The threats from Defendant against
 Plaintiff resulted in Plaintiff’s employer requiring
 her to work from home because of safety concerns at
 her employer’s office. She was not allowed to return
 to work at her office from September 2016 through
 the date of this hearing. These threats by Defendant
 also resulted in the minor child being restricted to
 be supervised by an adult while outside at her home.
 The minor child had to be advised of how to respond
 if Defendant appeared at her home at her mother’s
 house, or school or any public location.

f. Under the DVPO the Defendant’s visitation with the
 minor child was to be supervised at Time Together.
 Once Defendant started supervised visits at Time
 Together, Defendant’s supervised visitation at Time
 Together had to stop as the result of the minor

 - 11 -
 HUML V. HUML

 Opinion of the Court

 child’s extremely negative reaction and behavior
 after these visits.

g. Defendant violated the supervised visitation rules
 that are imposed by Time Together. During his
 second visit Defendant whispered to the minor child
 and had to be redirected by the staff at Time
 Together. Defendant objected to Time Together
 visits because it was not “natural” and didn’t allow
 him to be himself with his daughter.

 This Court is not able to rule out that the Defendant
 has had inappropriate sexual contact with the minor
 child or rule out that Defendant has engaged
 [in] sexualized behavior in the minor child’s
 presence.

h. Defendant has willfully ignored the Court Orders in
 his case regarding public visitation with the minor
 child. Plaintiff had to hire a private investigator to
 follow the Defendant during his public visitations
 because of Plaintiff's concerns that the Defendant
 was not following the requirement that Defendant’s
 visit occur in a public location as most recently set
 forth in this Court’s April Temporary Order. The
 private investigator observed the Defendant
 remov[ing] the minor child from specific public
 locations where he told the Plaintiff that he would
 be exercising his public visitation with the minor
 child. The Plaintiff’s private investigator, Michael
 Flowers with Cat’s Eye Investigations, found that
 the Defendant removed the minor child from these
 locations. On one such occasion as soon as Plaintiff
 dropped off the minor child for a visit the Defendant
 took the minor child and immediately exited the
 location through a side door and walked through an
 adjacent building to ultimately take the minor child
 to a[] parking garage. During multiple visits, once
 the Defendant entered in the parking garage, the
 Defendant would get into rental car or truck.

 - 12 -
 HUML V. HUML

 Opinion of the Court

 Defendant would have already backed the rental car
 into a parking space[]. By removing the child from
 his public visitation this allowed the Defendant to be
 alone with the minor child. The private investigator
 could not determine that Defendant was facetiming,
 only that the minor child was looking at an iPad or
 mobile phone. This also allowed Defendant to have
 the minor child facetime with [Karen] Huml--
 another violation of the April Temporary Order. It is
 concerning that Defendant was removing the minor
 child from public and taking her to locations where
 she was isolated and sitting in the back seat of a
 rental car with the Defendant. Defendant’s
 explanation about backing into parking spaces,
 using a rental car instead of his personal vehicle,
 and insisting that Defendant and the minor child
 had to eat food that he prepared at home in the back
 seat of a vehicle rather than at the public location
 was not credible. The private investigator also
 observed an angry outburst by the Defendant while
 he was with the minor child at the IMAX movie
 theater in Raleigh which was directed toward an
 employee working at the IMAX theater. On another
 occasion, the private investigator observed the
 minor child crying while she was walking with the
 Defendant in public.

i. Based on the foregoing findings of fact the
 Defendant cannot put the needs of the minor child
 first. Defendant blames everyone but himself.
 Defendant does not take responsibility for his
 actions. Defendant is very smart. Defendant took
 steps during his public visits with the minor child to
 do what he wanted to do while ignoring restrictions
 that were in place to protect the minor child. It is
 impossible to believe that Defendant did not know
 that his actions would have a detrimental impact on
 the minor child.

j. It is in the child’s best interests and welfare of the

 - 13 -
 HUML V. HUML

 Opinion of the Court

 minor child that she have no further contact with the
 Defendant. The minor child’s anxiety and stress
 level decreases when the child has no contact with
 Defendant. The minor child’s physical symptoms
 such as stomach pains also are eliminated when she
 does not have contact with Defendant. The minor
 child performed exceptionally well in school,
 including being accepted to the Duke University
 TIPS program.

 k. The Plaintiff and minor child have reasons to fear
 the Defendant.

 l. For almost two years the Defendant has failed to
 take opportunities to change his behavior and to be
 a positive influence in his daughter’s life. Defendant
 has failed to take the opportunity to exercise
 visitations with his child, and when he did take
 those visits he repeatedly violated court orders
 concerning the restrictions placed on him to
 including, but not limited to, removing the minor
 child from public visits, exposing the child to [Karen]
 Huml, and failing to follow the clear rules
 established at Time Together.

 m. As the direct result of his actions, confrontational
 attitude and failure to act in a manner consistent
 with his parental responsibilities to provide support,
 love, and guidance, the Defendant has had a
 detrimental influence on his daughter since at least
 July 2015.

The trial court concluded:

 4. There has been a substantial change in
 circumstances warranting a modification of custody
 as set forth herein.

 5. Plaintiff is a fit and proper person to have sole legal
 and exclusive physical custody of the minor child as

 - 14 -
 HUML V. HUML

 Opinion of the Court

 set forth herein.

 6. Defendant is a not a fit and proper person to have
 any visitation or contact with the minor child as set
 forth herein.

 7. This Order is in the best interests and welfare of the
 minor child.

 The trial court decreed:

 2. Defendant shall not have any custodial time with
 the minor child.

 3. Defendant shall have no contact with the minor
 child. Defendant shall not be allowed to speak with
 the minor child. Defendant shall not be allowed to
 communicate to the minor child in any format,
 including, but not limited to, no letters, no email, no
 text messaging, no face-to-face communication, and
 no telephone calls.

 4. Defendant shall not have any access to the minor
 child. Defendant shall not have the ability to obtain
 any information concerning the minor child
 including, but not limited to, requesting information
 through third party care givers, teachers, medical
 professionals, instructors or coaches.

 5. Defendant shall have no contact with the Plaintiff.
 Defendant shall not be allowed to speak with the
 Plaintiff. Defendant shall not be allowed to
 communicate with the Plaintiff in any format,
 including, but not limited to, no letters, no email, no
 text messaging, no face-to-face communication, and
 no telephone calls.

Father timely filed notice of appeal from this order.

 II. Standard of Review

 - 15 -
 HUML V. HUML

 Opinion of the Court

 In Shipman v. Shipman, our Supreme Court set forth the requirements for

modification of a custody order, and this Court’s standard of review of an order

modifying custody. See Shipman v. Shipman, 357 N.C. 471, 473-75, 586 S.E.2d 250,

253-54 (2003).

 It is well established in this jurisdiction that a trial
 court may order a modification of an existing child custody
 order between two natural parents if the party moving for
 modification shows that a substantial change of
 circumstances affecting the welfare of the child warrants a
 change in custody. The party seeking to modify a custody
 order need not allege that the change in circumstances had
 an adverse effect on the child. While allegations concerning
 adversity are acceptable factors for the trial court to
 consider and will support modification, a showing of a
 change in circumstances that is, or is likely to be, beneficial
 to the child may also warrant a change in custody.
 As in most child custody proceedings, a trial court’s
 principal objective is to measure whether a change in
 custody will serve to promote the child’s best interests.
 Therefore, if the trial court does indeed determine that a
 substantial change in circumstances affects the welfare of
 the child, it may only modify the existing custody order if
 it further concludes that a change in custody is in the
 child’s best interests.
 The trial court’s examination of whether to modify
 an existing child custody order is twofold. The trial court
 must determine whether there was a change in
 circumstances and then must examine whether such a
 change affected the minor child. If the trial court concludes
 either that a substantial change has not occurred or that a
 substantial change did occur but that it did not affect the
 minor child’s welfare, the court’s examination ends, and no
 modification can be ordered. If, however, the trial court
 determines that there has been a substantial change in
 circumstances and that the change affected the welfare of
 the child, the court must then examine whether a change

 - 16 -
 HUML V. HUML

 Opinion of the Court

 in custody is in the child’s best interests. If the trial court
 concludes that modification is in the child’s best interests,
 only then may the court order a modification of the original
 custody order.
 When reviewing a trial court’s decision to grant or
 deny a motion for the modification of an existing child
 custody order, the appellate courts must examine the trial
 court’s findings of fact to determine whether they are
 supported by substantial evidence. Substantial evidence is
 such relevant evidence as a reasonable mind might accept
 as adequate to support a conclusion.
 Our trial courts are vested with broad discretion in
 child custody matters. This discretion is based upon the
 trial courts’ opportunity to see the parties; to hear the
 witnesses; and to detect tenors, tones, and flavors that are
 lost in the bare printed record read months later by
 appellate judges. Accordingly, should we conclude that
 there is substantial evidence in the record to support the
 trial court’s findings of fact, such findings are conclusive on
 appeal, even if record evidence might sustain findings to
 the contrary.
 In addition to evaluating whether a trial court’s
 findings of fact are supported by substantial evidence, this
 Court must determine if the trial court’s factual findings
 support its conclusions of law. With regard to the trial
 court’s conclusions of law, our case law indicates that the
 trial court must determine whether there has been a
 substantial change in circumstances and whether that
 change affected the minor child. Upon concluding that such
 a change affects the child’s welfare, the trial court must
 then decide whether a modification of custody was in the
 child’s best interests. If we determine that the trial court
 has properly concluded that the facts show that a
 substantial change of circumstances has affected the
 welfare of the minor child and that modification was in the
 child’s best interests, we will defer to the trial court’s
 judgment and not disturb its decision to modify an existing
 custody agreement.

Id. (citations, quotation marks, and brackets omitted).

 - 17 -
 HUML V. HUML

 Opinion of the Court

 III. Issues and Analysis

 Father first argues “the trial court erred in failing to make sufficient factual

findings regarding the best interest of the child[,]” (original in all caps), but Father’s

approximately one-page argument on this issue does not address best interests at

all.3 Instead, Father contends two portions of findings of fact regarding possible

inappropriate sexual contact between Father and Susan are not supported by the

evidence.

A. Findings of Fact

 The two challenged portions of the findings are, “Plaintiff was alerted to the

fact that Defendant was exhibiting ‘grooming’ behaviors toward his daughter” and

“[t]his Court is not able to rule out that the Defendant has had inappropriate sexual

contact with the minor child or rule out that Defendant has engaged in sexualized

behavior in the minor child’s presence.”

 But the trial court did not find that any inappropriate sexual contact or

behavior actually happened. Also, while Father claims that the “grooming” finding

is “a bare recitation of Appellee’s testimony” it is more properly characterized as the

trial court’s summary of Mother’s extensive testimony regarding her concerns about

Father’s actions toward Susan. And Father contends the “inappropriate sexual

3 Father attempts to raise other issues in his reply brief, but he has waived these arguments. See
State v. Triplett, ___ N.C. App. ___, ___, 810 S.E.2d 404, 407–08 (2018) (“Defendant may not use his
reply brief to make new arguments on appeal. A reply brief is not an avenue to correct the deficiencies
contained in the original brief.” (citation, quotation marks, and brackets omitted)).

 - 18 -
 HUML V. HUML

 Opinion of the Court

contact” finding “fails to acknowledge the conflicting testimony of the therapist or the

CPS investigation,” but the finding actually notes the conflict by stating that the trial

court “cannot rule out” the behavior. In other words, the trial court was concerned

about the possibility of inappropriate sexual behavior but the evidence was not

sufficient for the trial court to make a finding it had occurred or had not occurred.

 Furthermore, even if these two portions of findings were omitted, the trial

court’s conclusions of law would still be supported by the remaining abundant and

detailed findings of fact. Thus, this argument is overruled. But Father challenges a

few other findings of fact, and his challenge is based only upon the admission of the

recordings of phone conversations, so we will next address that issue.

B. Admission of Recordings

 Defendant argues that “[t]he trial court erred in admitting the recorded

conversations submitted as Plaintiff-Appellee’s exhibits #1-4 as the recordings were

insufficiently authenticated and the admission of the evidence was prejudicial to

Appellant.” The recordings were mentioned many times during the testimony of

witnesses. Dr. Diane Meisburger, Susan’s therapist, testified about her reasons for

concern about Susan’s safety; one reason for her concern was Father’s statements in

the recordings threatening to kill Mother and his cursing about being required to go

to an anger management program. At this point, the recordings themselves were not

played or introduced but were discussed only as part of the information Dr.

 - 19 -
 HUML V. HUML

 Opinion of the Court

Meisburger had considered. Father’s attorney objected, “We haven’t heard this

recording. Again, we are talking about something that has not been entered into

evidence, hasn’t been offered. There is no foundation. I don’t think it is appropriate

for her to speak to it.” Mother’s attorney responded that Father’s attorney had

“opened the door” for it when she asked about the basis for Dr. Meisburger’s

testimony about concern for Susan’s safety. The trial court allowed this line of

questioning without further objection.

 Later in the trial, other witnesses also testified about hearing the recordings

and their responses to the recordings; Father did not object. For example, Mother

first learned about the recordings when the parenting coordinator was notified by

Karen that Father “had threatened to kill [Mother] three different” ways. Based upon

these threats, Mother contacted the police and “went into hiding,” staying out of town

at a hotel in an undisclosed location. Mother actually heard the recordings a few days

later at her attorney’s office. Based upon these threats, Mother filed for a Domestic

Violence Protective Order on 14 September 2016. Mother had also learned that

Father was arrested for assault on a female involving Karen on 8 September 2016;

this was his second arrest for assaulting Karen.

 Mother testified that she could recognize the voice on the recordings as Father.

Mother’s counsel then presented the recordings themselves as exhibits and moved for

admission into evidence, noting that “Mr. Huml has heard this. He has heard the

 - 20 -
 HUML V. HUML

 Opinion of the Court

recordings. Any authentication issue, if he is saying it is not him, then he can testify

to that, but she is able to ident – authenticate his voice and identify it.” Father’s

counsel did not dispute she had heard the recordings and did not raise any further

question regarding authentication or any other objection. The recordings were then

played, and Mother testified about each one.

 Father has waived his argument regarding admission of the recordings as he

did not object to the admission of any of the recordings.

 In order to preserve an issue for appellate review, a party
 must have presented to the trial court a timely request,
 objection, or motion, stating the specific grounds for the
 ruling the party desired the court to make if the specific
 grounds were not apparent from the context. It is also
 necessary for the complaining party to obtain a ruling upon
 the party’s request, objection, or motion.

N.C. App. P. 10(a)(1); see Hoover v. Hoover, ___ N.C. App. ___, ___, 788 S.E.2d 615,

618, disc. review denied, 369 N.C. 187, 794 S.E.2d 519 (2016) (“As a general rule, the

failure to raise an alleged error in the trial court waives the right to raise it for the

first time on appeal.” (citation and quotation marks omitted)). Father does not argue

that the findings of fact based upon the recordings are not supported by that evidence.

Therefore, the trial court did not err in allowing the recordings to be admitted as

evidence, and all of the trial court’s findings of fact were supported by the evidence.

This argument is without merit.

C. Denial of Contact with the Child

 - 21 -
 HUML V. HUML

 Opinion of the Court

 Father next contends “the trial court erred in denying [him] access to any

contact with or information concerning” Susan. (Original in all caps.) Father argues

that he “has been barred from access to any information which would allow him to

seek modification of the Order in the future.” Specifically, Father claims these

paragraphs of the decree “remove[] all of [Father’s] remaining parental rights with

respect to access to any information concerning” Susan:

 2. Defendant shall not have any custodial time with
 the minor child.

 3. Defendant shall have no contact with the minor
 child. Defendant shall not be allowed to speak with
 the minor child. Defendant shall not be allowed to
 communicate to the minor child in any format,
 including, but not limited to, no letters, no email, no
 text messaging, no face-to-face communication, and
 no telephone calls.

 4. Defendant shall not have any access to the minor
 child. Defendant shall not have the ability to obtain
 any information concerning the minor child
 including, but not limited to, requesting information
 through third party care givers, teachers, medical
 professionals, instructors or coaches.

 5. Defendant shall have no contact with the Plaintiff.
 Defendant shall not be allowed to speak with the
 Plaintiff. Defendant shall not be allowed to
 communicate with the Plaintiff in any format,
 including, but not limited to, no letters, no email, no
 text messaging, no face-to-face communication, and
 no telephone calls.

 ....

 - 22 -
 HUML V. HUML

 Opinion of the Court

 11. Should the Plaintiff desire to relocate with the minor
 child, she shall not be required to provide any
 information to the Defendant. Plaintiff shall be
 allowed to pursue any additional privacy protections
 as allowed for victims of domestic violence.

Father also argues that the order is “the functional equivalent of the termination of

his parental rights.” Father cites only “Pulliam v. Smith, 348 N.C. 616, 501 S.E.2d

898, 900 (1998) . . . . and N.C.G. S. § 50-13.7(a)” in support of his argument, though

it is not entirely clear how they relate to his argument; Father seems to be contending

that without access to information about Susan he would never be able to seek

modification of custody, so his parental rights have been effectively terminated.

 We first note that after briefs in this case were filed and the case was heard,

this Court issued an opinion, Routten v. Routten, ___ N.C. App. ___, 822 S.E.2d 436

(2018) (COA17-1360), which appears to establish a different standard for denial of

visitation to a parent than prescribed by well-established North Carolina Supreme

Court and Court of Appeals precedent.4 See, e.g., Owenby v. Young, 357 N.C. 142, 579

S.E.2d 264 (2003); Adams v. Tessener, 354 N.C. 57, 550 S.E.2d 499 (2001); Price v.

Howard, 346 N.C. 68, 484 S.E.2d 528 (1997); Petersen v. Rogers, 337 N.C. 397, 445

S.E.2d 901 (1994). Throughout the opinion and in its conclusion, Routten relies on

Owenby, see Routten N.C. App. at ___, 822 S.E.2d at ___, but fails to note that Owenby

4 There was a dissent in Routten, and the case was appealed to the North Carolina Supreme Court;
that appeal is still pending.

 - 23 -
 HUML V. HUML

 Opinion of the Court

involved a dispute between a parent and a non-parent third party, and that the

Supreme Court explicitly stated that “the protected right is irrelevant in a custody

proceeding between two natural parents, whether biological or adoptive, or between

two parties who are not natural parents. In such instances, the trial court must

determine custody using the best interest of the child test.” Owenby, 357 N.C. at 142-

45, 579 S.E.2d at 265-67 (emphasis added) (citation and quotation marks omitted).

Other Supreme Court cases cited by Routten, see generally Routten, ___ N.C. App.

___, 822 S.E.2d 436, unlike Routten itself, also distinguish between the standards

applicable to custody disputes between two parents (or two non-parents) and a parent

versus a non-parent. See Adams, 354 N.C. at 58-61, 550 S.E.2d at 500-02 (involving

a custody dispute between parents and grandparents and providing that “[i]n a

custody proceeding between two natural parents (including biological or adoptive

parents), or between two parties who are not natural parents, the trial court must

determine custody based on the best interest of the child test. Price, however, involved

a custody dispute between a natural parent and a third party who is not a natural

parent. After acknowledging the Petersen presumption—that natural parents have a

constitutionally protected, paramount right to custody of their children—we

conducted a due-process analysis in which the parent’s well-established paramount

interest in the custody and care of the child is balanced against the State’s well-

established interest in protecting the welfare of children”) (emphasis added) (citations

 - 24 -
 HUML V. HUML

 Opinion of the Court

and quotation marks omitted)); see also Price, 346 N.C. at 71-72, 484 S.E.2d at 529-

30 (involving a custody dispute between a parent and a non-parent and noting, “[t]he

General Assembly has prescribed the standard to be applied in a custody proceeding

in North Carolina in N.C.G.S. § 50–13.2, which provides that an order for custody of

a minor child entered pursuant to this section shall award the custody of such child

to such person, agency, organization or institution as will best promote the interest

and welfare of the child. Therefore, in a custody dispute between two natural parents

(we intend this phrase to include both biological and adoptive parents) or between two

parties who are not natural parents, this best interest of the child test must be applied.

The case now before us, however, is between a natural parent and a third party who is

not a natural parent”) (emphasis added) (citation and quotation marks omitted);

Petersen, 337 N.C. at 399-404, 445 S.E.2d at 902-05 (involving a custody dispute

between adoptive parents and natural parents after adoption was declared void and

stating, “[f]urther, plaintiffs argue that as to parents’ custodial rights, our law

recognizes no more than a higher evidentiary standard which must apply in custody

disputes between parents and those who are not natural parents; but the welfare of

the child is paramount to all common law preferential rights of the parents. In light

of Flores, Stanley, and the principles enunciated in Jolly and Hughes, we explicitly

reject these arguments. We hold that absent a finding that parents (i) are unfit or (ii)

have neglected the welfare of their children, the constitutionally-protected

 - 25 -
 HUML V. HUML

 Opinion of the Court

paramount right of parents to custody, care, and control of their children must

prevail. Language to the contrary in Best v. Best, 81 N.C. App. at 342, 344 S.E.2d at

367, is hereby expressly disavowed.” (quotation marks omitted)).

 Further, recent publication of Routten exacerbates the quandary presented by

In re Civil Penalty, 324 N.C. 373, 379 S.E.2d 30 (1989), as noted by the dissent in

Routten:

 At first glance, this approach might seem appropriate.
 After all, In re Civil Penalty tells us that one panel cannot
 overrule another on the same issue. If it appears a second
 panel did precisely that by refusing to follow the precedent
 set by the first panel, should the third panel faced with the
 issue not ignore the second and follow the first? But, what
 if a fourth panel comes along and concludes that the second
 panel properly distinguished or limited the first panel?
 That fourth panel could refuse to follow the third panel on
 the ground that it improperly overruled the second.

Routten, ___ N.C. App. at ___, 822 S.E.2d at 449 (Inman, J., dissenting) (citation

omitted).5 “Where a panel of the Court of Appeals has decided the same issue, albeit

in a different case, a subsequent panel of the same court is bound by that precedent,

unless it has been overturned by a higher court.” In re Civil Penalty, 324 N.C. at 384,

379 S.E.2d at 37. The dilemma of In Re Civil penalty arises when panels of this Court

have decided the same issue two different ways, since we are theoretically bound by

two opposing precedents or lines of precedent. And the Court may have a double

5 Routten includes an extensive discussion of In Re Civil Penalty due to the conflict in prior cases
issued by this Court. See Routten, ___ N.C. App. at ___, 822 S.E.2d at 444-47. Fortunately, the North
Carolina Supreme Court now has the opportunity to resolve this conflict in the appeal of Routten.

 - 26 -
 HUML V. HUML

 Opinion of the Court

dilemma where a prior panel of this Court has addressed not only the underlying

issue but also the effect of In Re Civil Penalty on the same issue in different ways.

See Routten, ___ N.C. App. at ___, 822 S.E.2d at 449 (Berger, J., concurring) (“As the

case before us here demonstrates, this Court can be trapped in a chaotic loop as

different panels disagree, not only on the interpretation of the law, but also on what

law appropriately controls the issue.”). We have that double dilemma here, since this

Court addressed the same issue and application of In re Civil Penalty in Respess, see

Respess v. Respess, 232 N.C. App. 611, 754 S.E.2d 691 (2014), coming to one

conclusion in 2014, and in Routten, coming to the opposite conclusion, in 2018. See

Routten, ___ N.C. App. ___, 822 S.E.2d 436.

 Yet we must resolve this double dilemma, and we conclude Respess is the

precedent which must be followed. Where there is a conflict in cases issued by this

Court addressing an issue, we are bound to follow the “earliest relevant opinion” to

resolve the conflict:

 Where a panel of the Court of Appeals has decided
 the same issue, albeit in a different case, a subsequent
 panel of the same court is bound by that precedent, unless
 it has been overturned by a higher court. Further, our
 Supreme Court has clarified that, where there is a
 conflicting line of cases, a panel of this Court should follow
 the older of those two lines. With that in mind, we find
 Skipper and Vaughn are irreconcilable on this point of law
 and, as such, constitute a conflicting line of cases. Because
 Vaughn is the older of those two cases, we employ its
 reasoning here.

 - 27 -
 HUML V. HUML

 Opinion of the Court

State v. Gardner, 225 N.C. App. 161, 169, 736 S.E.2d 826, 832 (2013) (citations and

quotation marks omitted). Thus, we turn to Respess. See Respess, 232 N.C. App. 611,

754 S.E.2d 691.

 In 2014, this Court addressed the same issue as to the required standard of

proof in a custody dispute between two parents and findings necessary to deny

visitation in Respess:

 Although courts seldom deny visitation rights to a
 noncustodial parent, a trial court may do so if it is in the
 best interests of the child:
 The welfare of a child is always to be treated
 as the paramount consideration. Courts are
 generally reluctant to deny all visitation
 rights to the divorced parent of a child of
 tender age, but it is generally agreed that
 visitation rights should not be permitted to
 jeopardize a child’s welfare.
 This principle is codified in N.C. Gen. Stat. § 50–13.5(i),
 which provides that:
 In any case in which an award of child custody
 is made in a district court, the trial judge,
 prior to denying a parent the right of
 reasonable visitation, shall make a written
 finding of fact that the parent being denied
 visitation rights is an unfit person to visit the
 child or that such visitation rights are not in
 the best interest of the child.
 The statutory language is straightforward and
 unambiguous and requires that if a trial court does not
 grant reasonable visitation to a parent, its order must
 include a finding either that the parent is an unfit person
 to visit the child or that visitation with the parent is not in
 the best interest of the child. Although our Supreme Court
 has not issued an opinion discussing this statute, during
 the past 30 years this Court has issued numerous opinions

 - 28 -
 HUML V. HUML

 Opinion of the Court

 applying N.C. Gen. Stat. § 50–13.5(i). For example, in King
 v. Demo, 40 N.C. App. 661, 666–667, 253 S.E.2d 616, 620
 (1979), we stated that:
 Unless the child’s welfare would be
 jeopardized, courts should be generally
 reluctant to deny all visitation rights to the
 divorced parent of a child of tender age.
 Moreover, G.S. 50–13.5(i) provides that prior
 to denying a parent the right of reasonable
 visitation, the trial court shall make a written
 finding of fact that the parent being denied
 visitation rights is an unfit person to visit the
 child or that such visitation rights are not in
 the best interest of the child.
 And, in Johnson v. Johnson, 45 N.C. App. 644, 647, 263
 S.E.2d 822, 824 (1980), we held that:
 In awarding visitation privileges the court
 should be controlled by the same principle
 which governs the award of primary custody,
 that is, that the best interest and welfare of
 the child is the paramount consideration. G.S.
 50–13.5(i) provides that in any case in which
 an award of child custody is made in a district
 court, the trial judge, prior to denying a
 parent the right of reasonable visitation, shall
 make a written finding of fact that the parent
 being denied visitation rights is an unfit
 person to visit the child or that such visitation
 rights are not in the best interest of the child.
 During the 33 years since Johnson was decided, we have
 consistently followed both its application of the best
 interests standard to disputes between parents regarding
 child custody and visitation, and its acceptance of the plain
 language of N.C. Gen. Stat. § 50–13.5(i).

Id. at 615–17, 754 S.E.2d at 696–97 (citations, quotation marks, ellipses, and brackets

omitted).

 - 29 -
 HUML V. HUML

 Opinion of the Court

 The Respess court addressed the same issue arguably presented here based

upon a conflict in the cases created by Moore v. Moore and determined that under In

Re Civil Penalty it was bound to follow the consistent precedents prior to Moore and

the plain language of North Carolina General Statute § 50-13.5(i). See id. at 615-17,

754 S.E.2d at 695-97. We are likewise bound to follow Respess, since it addressed the

same underlying issue and analysis of a conflict in the cases under In Re Civil Penalty

as we do here, see id., 232 N.C. App. 611, 754 S.E.2d 691, since it was decided in 2014

and Routten in 2018. See Routten, ___ N.C. App. ___, 822 S.E.2d 436.

 Addressing Father’s argument and our dissenting colleague’s position that the

order on appeal effectively terminates his parental rights, we first note that a custody

proceeding under Chapter 50 is neither functionally nor legally the equivalent of a

proceeding for termination of parental rights. Contrast with N.C. Gen. Stat. Chap.

50; Chap. 7B (2017). Custody proceedings under Chapter 50 differ procedurally and

substantively from a proceeding to terminate parental rights under Article 11 of

Chapter 7B, from the initiation of the actions to the end results. Contrast with N.C.

Gen. Stat. Chap. 50; Chap. 7B (2017). Further, the procedures set forth by Chapter

7B control over any conflicting procedures set out by the Rules of Civil Procedure.

See Matter of Peirce, 53 N.C. App. 373, 380, 281 S.E.2d 198, 203 (1981) (“Due to the

legislature’s prefatory statement in G.S. 7A-289.22 with regard to its intent to

establish judicial procedures for the termination of parental rights, and due to the

 - 30 -
 HUML V. HUML

 Opinion of the Court

specificity of the procedural rules set out in the article, we think the legislative intent

was that G.S., Chap. 7A, Art. 24-B, exclusively control the procedure to be followed

in the termination of parental rights. It was not the intent that the requirements of

the basic rules of civil procedure of G.S. 1A-1 be superimposed upon the requirements

of G.S., Chap. 7A, Art. 24-B.”).

 Before ordering termination of parental rights, the trial court must find

specific grounds as provided by North Carolina General Statute § 7B-1111 by clear,

cogent, and convincing evidence and must find that termination is in the child’s best

interest. See In re C.C., 173 N.C. App. 375, 380, 618 S.E.2d 813, 817 (2005) (“A

proceeding to terminate parental rights is a two step process with an adjudicatory

stage and a dispositional stage. A different standard of review applies to each stage.

In the adjudicatory stage, the burden is on the petitioner to prove by clear, cogent,

and convincing evidence that one of the grounds for termination of parental rights set

forth in N.C. Gen. Stat. § 7B–1111(a) exists. . . . If the petitioner meets its burden of

proving at least one ground for termination of parental rights exists under N.C. Gen.

Stat. § 7B-1111(a), the court proceeds to the dispositional phase and determines

whether termination of parental rights is in the best interests of the child.”).

Termination of parental rights “completely and permanently terminates all rights

and obligations of the parent to the juvenile and of the juvenile to the parent arising

from the parental relationship, except that the juvenile’s right of inheritance from

 - 31 -
 HUML V. HUML

 Opinion of the Court

the juvenile’s parent shall not terminate until a final order of adoption is issued.”

N.C. Gen. Stat. § 7B-1112 (2017). Termination of parental rights makes a child

available for adoption by another person, rendering the child a legal stranger to the

biological parent. See In re Estate of Edwards, 316 N.C. 698, 706, 343 S.E.2d 913,

918 (1986) (“Adoption effects a complete substitution of families and makes the child

legally a stranger to the bloodline of his natural parents.”). Termination cuts off the

obligation of the parent to pay child support. See In re Tate, 67 N.C. App. 89, 95–96,

312 S.E.2d 535, 540 (1984) (“A parent retains an obligation to pay support up to the

actual adjudication of termination of parental rights.”).

 But the most crucial difference in this case is that a Chapter 50 custody order

can always be modified based upon a substantial change in circumstances affecting

the best interest of the child, see Shipman, 357 N.C. at 473, 586 S.E.2d at 253, while

an order terminating parental rights is permanent and ends all legal rights to the

child. See N.C. Gen. Stat. § 7B-1112. After termination, parental rights cannot be

restored, no matter what changes may occur in the lives of the parent or the child

after the order is entered. See id. In fact, a parent whose rights have been terminated

has no standing to legitimate a child, even with the consent of the other parent. See

Gorsuch v. Dees, 173 N.C. App. 223, 227, 618 S.E.2d 747, 750 (2005) (“We find

unconvincing Petitioner’s argument that ‘permanent’ as used in North Carolina

General Statutes section 7B–1112 should be construed as temporary and modifiable

 - 32 -
 HUML V. HUML

 Opinion of the Court

to be without merit. Where the statutory language is clear and unambiguous, the

Court does not engage in judicial construction but must apply the statute to give effect

to the plain and definite meaning of the language. Dictionaries may be used to

determine the plain meaning of language. Permanent means ‘continuing or enduring

(as in the same state, status, place) without fundamental or marked change; not

subject to fluctuation or alteration.’ We find Petitioner’s argument that the

‘permanent’ termination of his parental rights could allow for modification and

restoration to be without merit. In sum, we find Petitioner’s argument that the trial

court erred in concluding that Petitioner had no standing or right under the law to

legitimate A.B.D. because his parental rights had been terminated to be without

merit.” (citations and quotation marks omitted)). In contrast to termination of

parental rights, child custody orders are modifiable “at any time” until the child is 18

years old. See N.C. Gen. Stat. § 50-13.7 (2017) (“Except as otherwise provided in G.S.

50-13.7A, an order of a court of this State for support of a minor child may be modified

or vacated at any time, upon motion in the cause and a showing of changed

circumstances by either party or anyone interested subject to the limitations of G.S.

50-13.10.” (emphasis added)).

 Our courts have long recognized that sometimes, a custody order denying a

parent all visitation or contact with a child may be in the child’s best interest:

 Although courts seldom deny visitation rights to a
 noncustodial parent, a trial court may do so if it is in the

 - 33 -
 HUML V. HUML

 Opinion of the Court

 best interests of the child:
 [T]he welfare of a child is always to be treated
 as the paramount consideration[.] . . . Courts
 are generally reluctant to deny all visitation
 rights to the divorced parent of a child of
 tender age, but it is generally agreed that
 visitation rights should not be permitted to
 jeopardize a child’s welfare.
 Swicegood v. Swicegood, 270 N.C. 278, 282, 154 S.E.2d 324,
 327 (1967) (citing Griffin v. Griffin, 237 N.C. 404, 75 S.E.2d
 133 (1953)). See also, In re Custody of Stancil, 10 N.C. App.
 545, 551, 179 S.E.2d 844, 848–49 (1971) (“‘The rule is well
 established in all jurisdictions that the right of access to
 one’s child should not be denied unless the court is
 convinced such visitations are detrimental to the best
 interests of the child.’”) (quoting Willey v. Willey, 253 Iowa
 1294, 1302, 115 N.W.2d 833, 838 (1962)). This principle is
 codified in N.C. Gen. Stat. § 50–13.5(i), which provides
 that:
 In any case in which an award of child custody
 is made in a district court, the trial judge,
 prior to denying a parent the right of
 reasonable visitation, shall make a written
 finding of fact that the parent being denied
 visitation rights is an unfit person to visit the
 child or that such visitation rights are not in
 the best interest of the child.

Respess v. Respess, 232 N.C. App. 611, 615–16, 754 S.E.2d 691, 696 (2014). The trial

court’s findings of fact support its conclusion that Father should have no direct

contact with Susan. In addition, because of Father’s threats to kill Mother, failure to

engage in therapy, complete failure to benefit from the DOSE program, and repeated

domestic violence with Karen, the trial court did not abuse its discretion in allowing

Mother not to inform Father of her and Susan’s address.

 - 34 -
 HUML V. HUML

 Opinion of the Court

 Father also contends there is no need for the trial court’s complete bar of his

access to information about Susan, even from third parties such as “teachers, medical

professionals, instructors or coaches.” While we agree that it is unusual for a parent

to have such limited rights regarding his child, the trial court did not abuse its

discretion by eliminating his access to information. This restriction of access to

information is based upon the specific facts of this case and the trial court described

its rationale in detail. In fact, the order on appeal is exceptionally detailed, well-

organized, and thorough.

 In Finding of Fact 68, which has 23 subsections, the trial court noted the

factual basis for the restrictions even to obtaining information from third parties.

Father’s actions and threats affected many third parties associated with the family,

to the detriment of Susan. Mother’s employer required her to “work from home

because of safety concerns at her employer’s office.” At the time of the hearing,

Mother had been working from home almost a year. Father’s threats and actions

made third-party professionals trying to help this family sufficiently concerned about

their own safety they would not see him unless another person was present and at

one point the child’s pediatrician stopped seeing her because of Father’s actions. The

trial court found that Father’s “anger and rage” are disturbing and have “had a

detrimental impact on not only the minor child to not feel safe around the Defendant

 - 35 -
 HUML V. HUML

 Opinion of the Court

but the Plaintiff, her parents, Plaintiff’s friends, Plaintiff’s co-workers and various

professionals involved with this family.”

 The trial court also made detailed findings regarding Father’s failure to follow

the requirements of prior orders. Based upon the trial court’s findings, if Father could

continue to contact third parties such as teachers, physicians, and coaches to get

information about the child, based upon his past behavior, it is likely that his anger

and threats would make them fearful for their own safety, just as the third parties

described in the order were. And to protect their own safety and the safety of their

workplaces, these third parties may reasonably refuse to work with Susan,

continuing to interfere with her ability to lead a normal life.

 Besides endangering the third parties who deal with Susan, allowing Father

to contact them to get information about Susan would endanger Mother and Susan

directly. Some of Father’s actions were unusual and disturbing, such as taking the

child to sit in a rental car in a parking garage with him when he was supposed to be

visiting in a public place. Father had a car of his own but rented a car and backed

into a parking space for these visits, apparently to avoid detection; this surreptitious

behavior raises additional concerns. And if he were allowed to get information from

third parties, Father would necessarily learn the addresses and locations where

Mother and Susan could be found. For example, if Father were permitted to obtain

Susan’s educational information, he would have to know the name and location of her

 - 36 -
 HUML V. HUML

 Opinion of the Court

school, and he would learn from the school records which classes Susan attends and

her usual daily schedule; he could then easily find Mother’s home simply by following

Susan’s school bus or following any person who picks her up from school. Under these

circumstances, it is in Susan’s best interest to prevent Father from having access to

information about her education and care because it protects Mother, Susan, and

third parties who deal with them. The trial court’s detailed and extensive findings of

fact support the decretal provisions, including barring Father from obtaining

information from third parties.

 Father’s argument that he would be unable to seek future modification of

custody without access to information about Susan is also without merit. Father fails

to recognize that the substantial changes which need to occur for him to resume a

relationship with Susan are changes that only he can make. We addressed a similar

situation in Walsh v. Jones, ___ N.C. App. ___, ___ S.E.2d ___ (Jan. 15, 2019) (COA18-

496), where several years after a custody order which “immediately and permanently

suspended and terminated” all visitation and contact of any sort with defendant-

father, the trial court later modified its custody order, allowing the father to resume

visitation, although he had not seen or had contact with the child for several years.

Id. at ___, ___ S.E.2d at ___. The trial court modified his visitation based upon the

defendant-father’s changes in his own life which addressed the problems which led to

the termination of his visitation, finding that the father

 - 37 -
 HUML V. HUML

 Opinion of the Court

 completed the [Drug Abuse Research Treatment] program;
 took various educational classes; consistently passed drug
 tests; stopped consuming drugs and alcohol; regularly
 attended church and participated in community service
 projects; became a member of a volunteer fire department;
 paid child support from his disability payment; did not
 have any dealings with any of his pre-incarceration
 associates; and lives with his mother who is a registered
 nurse.

 Id. at ___, ___ S.E.2d at ___ (quotation marks and brackets omitted). Here, as in

Walsh, see id., ___ N.C. App. ___, ___ S.E.2d ___, Father’s lack of access to information

about Susan’s care does not prevent him from taking the steps he needs to take to

have the opportunity to change the custodial arrangement in the future. The order

does not prevent Father from taking his medication as prescribed, seeking treatment

and counseling to control his anger, ceasing his acts of violence against Karen, and

ceasing his threats of violence against Plaintiff and others involved in this case. If

Father does the things the trial court has repeatedly ordered him to do throughout

this case and can show he has changed and can provide a safe and loving environment

for Susan, he has the same opportunity as any parent to request a change in custody

based upon a substantial change in circumstances which would positively affect the

minor child; his positive behavior could be such a change. See Shipman, 357 N.C. at

473-74, 586 S.E.2d at 253. (“While allegations concerning adversity are acceptable

factors for the trial court to consider and will support modification, a showing of a

 - 38 -
 HUML V. HUML

 Opinion of the Court

change in circumstances that is, or is likely to be, beneficial to the child may also

warrant a change in custody.”) This argument is overruled.

 IV. Conclusion

 We affirm.

 AFFIRMED.

 Judge DILLON concurs with separate opinion.

 Judge BERGER dissents with separate opinion.

 - 39 -
No. COA 18-484 – HUML v. HUML

 DILLON, Judge, concurring.

 I fully concur in the majority opinion.

 In this Chapter 50 custody case between two natural parents, the trial court

granted sole legal and physical custody of the child to Mother, and further prohibited

Father from any visitation with and access to information about the child. The trial

court based its order on its determination that this arrangement was in the best

interest of the child. And there was evidence to support this order.

 The main disagreement between the majority and the dissent concerns

whether the trial court used the correct standard in weighing the evidence:

 The majority states that the trial court correctly applied the “preponderance of

the evidence” standard.

 The dissent, however, relies on two cases from our Court which suggest that

where a trial court orders that one parent is not allowed any custody, visitation, or

the right to information in a Chapter 50 custody dispute with the other parent, the

trial court must use a heightened “clear, cogent, and convincing” standard. Routten

v. Routten, ___ N.C. App. ___, ___, 822 S.E.2d 436, 444 (2018); Moore v. Moore, 160

N.C. App. 569, 573-74, 587 S.E.2d 74, 76 (2003).

 I agree with the majority that our law does not require this heightened

standard in a Chapter 50 custody dispute between parents. See Owenby v. Young,

357 N.C. 142, 145, 579 S.E.2d 264, 267 (2003) (holding that making a determination
 HUML V. HUML

 DILLON, J., concurring

based on the heightened standard “is irrelevant in a [Chapter 50] custody proceeding

between two natural parents[.]”).

 The dissent correctly notes that the Due Process Clause protects the

fundamental right of natural and adoptive parents to make decisions concerning the

care, custody, and control of their children. And it is well-settled that where a

parent’s rights are completely stripped in a Chapter 7B termination case – whether

in an action brought by the other parent or by a third party – the trial court must

apply the heightened “clear, cogent, and convincing” standard. In re Oghenekevebe,

123 N.C. App. 434, 437, 473 S.E.2d 393, 396 (1996). It is also well-settled that this

heightened standard must be applied in a Chapter 50 custody action where a parent’s

rights are abrogated in favor of a non-parent; e.g., granting visitation rights to a

grandparent, because such orders affect the “constitutionally protected paramount

right of parents” to their children. Owenby, 357 N.C. at 145, 579 S.E.2d at 266.

 However, with the exception of the two cases cited by our dissenting colleague,

our courts have uniformly recognized that, in a Chapter 50 custody dispute between

two parents, a trial court may abrogate a parent’s right to care, custody, and control

in favor of the other parent without using the heightened “clear, cogent, and

convincing” standard. Owenby, 357 N.C. at 145, 579 S.E.2d at 267. Indeed, every

Chapter 50 order which does not grant equal, joint custody to both parents effectively

is taking away some of the care, custody, and control rights previously enjoyed by one

 2
 HUML V. HUML

 DILLON, J., concurring

of the parents.6 For example, a Chapter 50 order may limit one parent’s rights to

supervised visitation, based on findings that the parent is not presently fit for

unsupervised visits.

 But a Chapter 50 custody order dividing the rights between two parents – no

matter the severity – is never as invasive of a parent’s fundamental right to care,

custody, and control as a Chapter 7B termination order. Under this Chapter 50 order,

Father retains the ability and right to move for reinstatement of some or all of his

previously-enjoyed rights by showing that he has changed his ways.7 But if his rights

were to be terminated under Chapter 7B, Father would have no opportunity to do so,

which is why a heightened standard is required in such cases.

 6 And it could be argued that even Chapter 50 orders that grant joint custody abrogate some
of the rights of each parent, by giving exclusive custody to each parent during different periods to the
exclusion of the other parent.
 7 I believe that the “best interest of the child” standard applied in Chapter 50 custody cases is
in harmony with protecting the Due Process rights of each parent to be involved with his child.
Specifically, I believe that there is a strong presumption that it is in the best interest of any child to
have a relationship with each parent, though, of course, this presumption can be overcome under the
right facts: A trial judge should view the best interest of the child issue at least partially through a
“constitutional lens” of considering the right of each parent to remain involved, as such involvement
is presumptively in the child’s best interest. So, in this case, if Father truly changes his ways and his
rights have not otherwise been terminated under Chapter 7B, there would be a strong argument that
the trial court would be de facto terminating Father’s rights if it refused to allow Father some
involvement in the life of his child, even if the child may be thriving at that time. But such is not the
case currently in this matter.

 3
 No. COA18-484 – Huml v. Huml

 BERGER, Judge, dissenting in separate opinion.

 Because clarity is needed in this area of the law as it relates to custody disputes

between parents when the trial court denies one parent all visitation and contact, I

respectfully dissent.

 Based upon the evidence in the record and the findings of the trial court,

Defendant-father clearly has issues that he needs to address. Because of these issues,

the trial court concluded as a matter of law that the father is “not a fit and proper

person to have any visitation or contact with the minor child . . . [and] [t]his order is

in the best interests and welfare of the minor child.” The trial court, in addition to

denying Defendant-father any physical custody or contact with the minor child,

denied Defendant-father all rights and responsibilities of parentage. The trial court

precluded Defendant-father from obtaining “any information concerning the minor

child,” (emphasis added) from teachers, medical professionals, third-party caregivers,

and other similar individuals. Upon entry of this order, there existed the very real

possibility that Defendant-father would not see his daughter again and would never

know anything about her. The practical effect of this custody order, which the

majority admits is “unusual,” is the termination of Defendant-father’s parental

rights.

 This order is far different from the situation in which visitation is denied.

Here, all contact is prohibited, as is the Defendant-father’s ability to obtain any
 HUML V. HUML

 BERGER, J., dissenting

information about the child. This may be the correct result, but there is case law

which requires a higher burden of proof before a parent can be deemed “unfit” and

thereafter cut off entirely from their biological child. This Court has previously held

that when a custody order is the functional equivalent of a termination of parental

rights, a parent must prove the other parent’s unfitness by clear, cogent, and

convincing evidence. Moore v. Moore, 160 N.C. App. 569, 573, 587 S.E.2d 74, 76

(2003).

 In Moore v. Moore, the biological parents engaged in a custody dispute over

their minor child. The father filed a motion to reinstate visitation after his visitation

rights had been suspended pending an investigation. The trial court determined that

it was in the best interests of the minor child that the order suspending visitation

remain in effect. This Court stated that, because the practical effect of the trial

court’s order was the termination of father’s parental rights, the standard of proof

required in termination proceedings was to be applied. Moore, 160 N.C. App. at 573,

587 S.E.2d at 76. Moore also noted that

 The “Due Process Clause of the Fourteenth Amendment
 protects the fundamental right of parents to make
 decisions concerning the care, custody, and control of their
 children.” Troxel v. Granville, 530 U.S. 57, 66, 147 L. Ed.
 2d 49, 57 (2000). “[A]bsent a finding that parents (i) are
 unfit or (ii) have neglected the welfare of their children, the
 constitutionally-protected paramount right of parents to
 custody, care, and control of their children must prevail.”
 Petersen v. Rogers, 337 N.C. 397, 403-404, 445 S.E.2d 901,
 905 (1994). N.C. Gen. Stat. § 50-13.5(i) states:

 2
 HUML V. HUML

 BERGER, J., dissenting

 [T]he trial judge, prior to denying a parent the
 right of reasonable visitation, shall make a
 written finding of fact that the parent being
 denied visitation rights is an unfit person to
 visit the child or that such visitation rights
 are not in the best interest of the child.

N.C. Gen. Stat. § 50-13.5(i) (2001). North Carolina courts
have held that unless the child’s welfare would be
jeopardized, courts generally should be reluctant to deny
all visitation rights to the divorced parent of a child of
tender age. Swicegood v. Swicegood, 270 N.C. 278, 154
S.E.2d 324 (1967). “In the absence of extraordinary
circumstances, a parent should not be denied the right of
visitation.” In re Custody of Stancil, 10 N.C. App. 545, 551,
179 S.E.2d 844, 849 (1971), (quoting Willey v. Willey, 253
Iowa 1294, 115 N.W.2d 833 (1962)). North Carolina case
law also states that when severe restrictions are placed on
the right of visitation, N.C. Gen. Stat. § 50-13.5(i) requires
the trial judge to make findings of fact supported by
competent evidence of unfitness of the parent or the judge
must find that the restrictions are in the best interest of
the child. Falls v. Falls, 52 N.C. App. 203, 208, 278 S.E.2d
546, 551 (1981); see also Johnson v. Johnson, 45 N.C. App.
644, 263 S.E.2d 822 (1980).
 It is presumed that fit parents act in the best
interest of their children. Troxel, 530 U.S. at 69, 147 L. Ed.
2d at 59. A parent’s right to a relationship with his child
is constitutionally protected. See Quilloin v. Walcott, 434
U.S. 246, 255, 54 L. Ed. 2d 511, 519 (1978). Once conduct
that is inconsistent with a parent’s protected status is
proven, the “best interest of the child” test is applied. Price
v. Howard, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997).
Without proof of inconsistent conduct, the “best interest”
test does not apply and the trial court is limited to finding
that the natural parent is unfit in order to prohibit all
visitation or contact with his or her child.
 The burden of proof rests upon the person seeking to
show by clear, cogent, and convincing evidence the

 3
 HUML V. HUML

 BERGER, J., dissenting

 unfitness of a natural parent to overcome his
 constitutionally protected rights. N.C. Gen. Stat. § 7B-
 1111(b) (2001). Here, in effect, the trial court terminated
 plaintiff’s right to visitation and any contact with his
 daughter without terminating his obligations as a parent.
 The proper evidentiary standard of proof in termination of
 parental rights proceedings is clear and convincing
 evidence. In re Montgomery, 311 N.C. 101, 109, 316 S.E.2d
 246, 252 (1984). In termination proceedings “the burden ...
 shall be upon the petitioner or movant to prove the facts
 justifying such termination by clear and convincing
 evidence.” N.C. Gen. Stat. § 7B-1111(b).
 Plaintiff was prohibited from all visitation rights or
 any contact whatsoever with his child. To sustain this total
 prohibition of visitation or contact, defendant must prove
 plaintiff’s unfitness. The trial court did not find the
 plaintiff to be an unfit parent based upon clear, cogent, and
 convincing evidence.

Moore, 160 N.C. App. at 572-74, 587 S.E.2d at 76-77.

 Here, the trial court effectively terminated Defendant-father’s parental rights

without findings by clear, cogent, and convincing evidence that Defendant-father was

an unfit parent. Under Moore, the trial court’s order is insufficient.

 4