618 S.E.2d 813 (2005)
In the Matter of C.C. J.C., minor children.
No. COA04-1448.
Court of Appeals of North Carolina.
September 20, 2005.
Mecklenburg County Attorney's Office, by J. Edward Yeager, Jr., Charlotte, for petitioner-appellee Mecklenburg County Department of Social Services.
Klein & Freeman, PLLC, by Katherine Freeman, Charlotte, for petitioner Guardian Ad Litem.
Mercedes O. Chut, Greensboro, for respondent-appellant.
*815 TYSON, Judge.
T.C.W. ("respondent") appeals from order terminating her parental rights to her two minor children, C.C. and J.C. (collectively, the "children"). We reverse.

I. Background
J.C. was born on 26 February 1993 and C.C. was born on 27 April 1995. In May 2000, the two children were referred to the Mecklenburg County Department of Social Services ("DSS"). Respondent agreed to a case plan designed to improve the children's living conditions. This case plan addressed three areas of concern: (1) lack of supervision for the children; (2) the mental health of respondent; and (3) living conditions in the home. Respondent agreed to provide better supervision of the children, attend parenting classes, continue mental health counseling, and provide sanitary living conditions for the children. She also agreed to monthly meetings with a social worker monitoring their case.
Giovanna Wilson ("Ms. Wilson") was the social worker assigned to the children from December 2000 to May 2001. Ms. Wilson "visited the home regularly" during that time and testified it "[t]ypically . . . was straightened up." In May 2001, Ms. Wilson found the house in a "very dirty" condition with dirty dishes all over the kitchen, "[t]he trash can was full and trash was coming out of the trash can," a full trash bag sitting on the kitchen floor, clothes strewn about on the steps, no sheets on the bed, and roaches in empty soda cans in respondent's room.
During that time period, respondent did not attend all of her mental health appointments. Ms. Wilson "received a lot of calls from the school that the children were not attending." These calls made Ms. Wilson suspect respondent was not properly supervising the children. On occasion, Ms. Wilson found the children outside playing while respondent was in bed upstairs. Ms. Wilson also received reports the children were having behavioral problems at school. She encouraged respondent to address these issues, but was unaware of any attempt by respondent to do so.
In May 2001, Ms. Wilson picked up the children from school one day after she could not reach respondent. When Ms. Wilson arrived at respondent's home, respondent was upstairs and offered no explanation where she had been. Upon returning home, six-year-old C.C. "put a pan on the stove and he was attempting to open up a can to cook."
On 3 May 2001, Ms. Wilson filed a juvenile petition. The petition alleged the children lacked proper parental supervision, did not attend school regularly, and lived in an "unkempt and unsanitary" home. Respondent did not contest the facts alleged in the petition. On 2 July 2001, the trial court accepted the facts as alleged in the petition with minor modifications and adjudicated the children to be neglected.
After assuming custody of the children, DSS continued to work with respondent to reunite the family. Starting in August 2001, social worker Kate Koebel ("Ms. Koebel") was assigned to the family. She augmented respondent's previous case plan after the children were found to be neglected. Under the amended case plan, respondent was also encouraged to: (1) obtain "a job or some other means of legal income;" (2) stay in contact with the children's therapist; (3) regularly attend therapy; (4) "participate in Family Preservation Services and in-home education services;" (5) "pay all of her bills in a timely manner;" and (6) to "maintain housing."
Respondent was unemployed when the children were initially taken into DSS custody. She obtained stable employment with the Charlotte Observer almost two years later, in April 2003, earning $6.50 per hour selling newspaper subscriptions by telephone and worked approximately seventeen hours per week. She voluntarily resigned from this job in early 2004. Prior to the Charlotte Observer job, she worked as a cashier for Jack-In-The-Box in Pineville, North Carolina where she worked for only two weeks earning approximately $100.00. Previous to the Jack-In-The-Box job, she worked "on and off" for her pastor "[f]iling, answering the phone, and cleaning" and earned approximately $150.00 per month.
*816 Respondent began to receive Supplemental Security Income in January 2004. She received disability income due to her "[s]leep apnea, severe back pain and depression." Initially, she received $389.50 per month. However, by 30 April 2004, she was receiving $564.00 per month. Respondent testified she was still looking for work as of April 2004. When asked what work she was seeking, respondent replied she had "an internet marketing business going on." Between August 2001 and May 2003, respondent was in danger of eviction on "a couple of occasions." Her monthly rent ranged between $25.00 and $40.00 per month.
Ms. Koebel characterized respondent's contact with the children's therapists as "not always consistent." After March 2003, the children's therapist requested respondent not be present at the children's counseling sessions. Respondent's attendance at her own counseling sessions was likewise sporadic until June 2003. Respondent participated in the Family Intervention Program and complied with the in-home education services.
Initially, the children had very limited visitation with respondent. They were allowed to visit for one hour each week at Walton Plaza. Soon after Ms. Koebel was assigned to the case, the family enjoyed visitation in respondent's home. The visits became progressively longer. Two hours each week unsupervised visitation became overnight visits, and finally evolved to weekend visitation. On at least one occasion, respondent elected not to have weekend visitation with the children because they had been especially rowdy the previous weekend. Respondent seemed to have an especially conflicted relationship with J.C. The visitation periods culminated in a month-long visitation with C.C. in January 2003. However, C.C. was removed from the home again because he was "not consistently getting his medication," missed some school, exhibited behavior problems at school, and was not consistently finishing his homework.
After June 2003, respondent attended all of her counseling sessions with her therapist Ms. Linda Lee Woodburn and showed progress. Ms. Koebel testified that in the year and one-half leading up to the hearing, respondent stabilized her housing situation and appropriately maintained it for the children. Respondent completed family education sessions with Ms. Angela Howard in September 2002 and completed another set of parenting classes on her own in February 2004.
In the court summary dated 20 May 2003, DSS recommended "the goal be changed to termination of parental rights and adoption regarding both children." On 28 October 2003, DSS filed petitions to terminate respondent's parental rights to J.C. and C.C. The petitions alleged the following grounds for termination of respondent's parental rights: (1) neglect; and (2) willfully leaving the children in foster care for more than twelve months without showing reasonable progress under the circumstances in correcting the conditions which led to the removal of the children.
The termination hearing was conducted over three days in March and April 2004. On 9 June 2004, the trial court entered an order terminating respondent's parental rights on both grounds alleged in the petitions. Respondent appeals.

II. Mootness
J.C. took his own life on 29 August 2004 after the filing of respondent's notice of appeal in this matter. DSS argues J.C.'s death renders this appeal moot with regard to him. We disagree.
Respondent continues to have parental rights of J.C. which continues after his death. Respondent may also have inheritance rights. N.C. Gen.Stat. § 29-15 (2003). Also, pursuant to N.C. Gen.Stat. § 7B-1111(a)(9)(2003), an order terminating parental rights can form the basis of a subsequent proceeding to terminate the parental rights of another child:
(a) The Court may terminate parental rights upon a finding of one or more of the following.
. . . .
(9) The parental rights of a parent with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent *817 lacks the ability or willingness to establish a safe home.
N.C. Gen.Stat. § 7B-1111(a)(9) (2003).
Respondent's parental rights of J.C. survive his death. The termination of parental rights can form the basis of a subsequent proceeding to terminate the rights of another child of respondent. We decline to dismiss this appeal as moot with respect to J.C.

III. Issues
The issues on appeal are whether: (1) respondent and the children were properly served; (2) sufficient evidence exists to support various findings of fact; (3) the findings of fact and evidence in the record support the statutory ground to terminate parental rights due to neglect; (4) the trial court committed reversible error in concluding as a matter of law that respondent willfully left her children in foster care for more than twelve months without showing reasonable progress; (5) the trial court erred in taking judicial notice of various materials; (6) the trial court committed reversible error in terminating respondent's parental rights without specific reference to the statutory grounds for doing so; (7) findings of fact and evidence in the record support the finding that it is in the best interest of the children to terminate parental rights; and (8) the trial court committed reversible error in failing to conduct a separate dispositional hearing during the best interests phase of the proceedings.

IV. Termination of Parental Rights

A. Standard of Review
A proceeding to terminate parental rights is a two step process with an adjudicatory stage and a dispositional stage. In re Blackburn, 142 N.C.App. 607, 610, 543 S.E.2d 906, 908 (2001). A different standard of review applies to each stage. Id. In the adjudicatory stage, the burden is on the petitioner to prove by clear, cogent, and convincing evidence that one of the grounds for termination of parental rights set forth in N.C. Gen.Stat. § 7B-1111(a) exists. Id. The standard for appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings of fact support its conclusions of law. In re Huff, 140 N.C.App. 288, 291, 536 S.E.2d 838, 840 (2000), disc. rev. denied, 353 N.C. 374, 547 S.E.2d 9 (2001). "Clear, cogent, and convincing describes an evidentiary standard stricter than a preponderance of the evidence, but less stringent than proof beyond a reasonable doubt." N.C. State Bar v. Sheffield, 73 N.C.App. 349, 354, 326 S.E.2d 320, 323 (1985) (citation omitted).
If the petitioner meets its burden of proving at least one ground for termination of parental rights exists under N.C. Gen.Stat. § 7B-1111(a), the court proceeds to the dispositional phase and determines whether termination of parental rights is in the best interests of the child. The standard of review of the dispositional stage is whether the trial court abused its discretion in terminating parental rights. In re Nesbitt, 147 N.C.App. 349, 352, 555 S.E.2d 659, 662 (2001).

B. Neglect
Respondent argues insufficient evidence supports findings of fact to conclude respondent neglected her children. We agree.
N.C. Gen.Stat. § 7B-1111(a)(1) (2003) provides a ground to terminate parental rights where "the parent has abused or neglected the juvenile." A neglected juvenile is defined as follows:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or has been placed for care or adoption in violation of law.
N.C. Gen.Stat. § 7B-101(15)(2003).
It is well-established that "[a] finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (emphasis supplied). "[A] prior adjudication of neglect *818 may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect." In re Ballard, 311 N.C. 708, 713-14, 319 S.E.2d 227, 231 (1984).
If the child is removed from the parent before the termination hearing, as in this case, then "the trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." Id. at 715, 319 S.E.2d at 232 (emphasis supplied). In those circumstances, "parental rights may nonetheless be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to [his] parents." In re Reyes, 136 N.C.App. 812, 815, 526 S.E.2d 499, 501 (2000) (emphasis supplied). A prior adjudication of neglect alone cannot justify termination of parental rights.
DSS presented no evidence that respondent could not, at the time of the hearing, adequately parent her children. In re Young, 346 N.C. at 248, 485 S.E.2d 612 at 615. Likewise, no evidence was presented and no finding was made that a probability of repetition of neglect existed at the time of the termination hearing. In re Ballard, 311 N.C. at 713-14, 319 S.E.2d at 231.
The hearing to terminate respondent's parental rights was held in March and April 2004. Petitioner called three witnesses to testify: Ms. Wilson, Angela Howard, and Ms. Koebel. Ms. Wilson worked as the social worker for the children between December 2000 and May 2001. Ms. Wilson testified that during the time she was involved with the family, there were concerns regarding the supervision of the children, the cleanliness of the house, and respondent's attendance at her counseling appointments. Ms. Wilson's involvement with respondent ended almost three years before the hearing to terminate respondent's parental rights. Because Ms. Wilson had no involvement with the family for almost three years before the termination proceeding, she was unable to testify whether neglect existed at that time and whether it was likely to occur in the future.
Ms. Howard provided family education services to respondent from June 2001 through September 2002. Respondent periodically contacted Ms. Howard after her family education sessions ended to ask for advice and to review the parenting videos. The most recent contact between respondent and Ms. Howard occurred the day before the hearing. Ms. Howard's testimony presents no evidence of events or circumstances in the time period between September 2002, when the family education sessions ended, and Spring 2004, when the hearing was held, to show respondent neglected the children. Ms. Howard could not testify whether neglect existed at the time of the hearing and did not offer any evidence of the probability of neglect in the future.
Ms. Koebel became the social worker for the children on 20 August 2001 and was their social worker at the time of the hearing. Even though Ms. Koebel's relationship with the family continued until the hearing, she presented no evidence that respondent was unfit as a parent at the time of the hearing. None of DSS's three witnesses testified to a probability of repetition of neglect.
The trial court erred in concluding as a matter of law that respondent willfully neglected the children. DSS failed to present any evidence showing neglect at the time of the termination hearing or the probability of repetition of neglect if the children were returned to respondent.

C. Reasonable Progress
Respondent next argues that the trial court erred in concluding that she willfully left the children in DSS's custody for more than twelve months without showing reasonable progress in correcting those conditions which led to the removal of the children. We agree.
N.C. Gen.Stat. § 7B-1111(a)(2) (2003) provides that the court has grounds to terminate parental rights where:
The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable *819 progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.
It is undisputed that the children had been in foster care for more than twelve months at the time DSS filed the petitions to terminate respondent's parental rights.
During the adjudicatory stage, "[t]he court shall take evidence, find the facts, and shall adjudicate the existence or nonexistence of any of the circumstances set forth G.S. 7B-1111 which authorize the termination of parental rights of the respondent." N.C. Gen. Stat. § 7B-1109(e) (2003). Here, the trial court failed to find that respondent acted willfully as required under N.C. Gen.Stat. § 7B-1111(a)(2).
A finding of willfulness does not require a showing that the parent was at fault. In re Oghenekevebe, 123 N.C.App. 434, 439, 473 S.E.2d 393, 398 (1996). "Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort." In re McMillon, 143 N.C.App. 402, 410, 546 S.E.2d 169, 175 (2001).
The trial court's order is devoid of any finding that respondent was "unwilling to make the effort" to make reasonable progress in remedying the situation that led to the adjudication of neglect. Id. The evidence presented at the hearing is directly contrary.
Respondent attended family education sessions with Ms. Howard and continued to contact Ms. Howard after the sessions ended to ask for advice and to review parenting videos. In February 2004, respondent completed another set of parenting classes on her own volition that she paid for herself. Ms. Koebel testified that respondent acquired appropriate housing, improved the conditions of her home so that they were appropriate, and maintained the conditions of her home. Respondent also attended therapy. Ms. Linda Lee Woodburn was respondent's therapist from July 2001 until February 2004. Ms. Woodburn testified that when she began seeing respondent, respondent's attendance at the therapy sessions was sporadic. Beginning 6 June 2003, respondent attended all therapy sessions. Ms. Woodburn testified that respondent had made progress in therapy.
Because the trial court's order does not contain adequate findings of fact that respondent acted "willfully" or made adequate findings on respondent's progress, the trial court erred in concluding that respondent willfully left the children in foster care for a period exceeding twelve months without making reasonable progress under the circumstances.

V. Conclusion
The trial court erred in concluding that respondent neglected the children and willfully left the children in foster care for a period exceeding twelve months without making reasonable progress under the circumstances. In light of our decision, we do not address respondent's remaining assignments of error. The trial court's order terminating respondent's parental rights is reversed.
Reversed.
Judges McCULLOUGH and BRYANT concur.