An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-845

Filed 17 June 2026

Cabarrus County, Nos. 24JA000088-120, 24JA000089-120

IN RE: E.R., A.R.

Appeal by Respondent-Mother and Respondent-Father from Order entered 4 June 2025 by Judge D. Brent Cloninger in Cabarrus County District Court. Heard in the Court of Appeals 21 April 2026.

*David A. Perez for Respondent-Appellant Mother.*

*Parent Defender Annick Lenoir-Peek, by Assistant Parent Defender Jacky L. Brammer, for Respondent-Appellant Father.*

*Hartsell & Williams, PA, by Emily J. Arnold, for Petitioner-Appellee Cabarrus County Department of Social Services.*

*Matthew D. Wunsche for Guardian ad litem.*

HAMPSON, Judge.

**Factual and Procedural Background**

Respondent-Parents appeal from an Order terminating their parental rights in Eric and Amanda.[1]  The Record before us tends to reflect the following:

On 2 October 2023, Cabarrus County Department of Social Services (DSS) received a report that a party had been thrown at Respondent-Father's home while Eric and Amanda were present, and the minor children had been exposed to drugs, alcohol, and domestic violence.  DSS interviewed Respondent-Father, who denied having a party and stated there had been "nothing going on[.]"  He reported he and Respondent-Mother were separated, Respondent-Mother had attacked him and his new girlfriend because she was jealous, and that Respondent-Mother drank heavily and was "always trying to fight him[.]"  DSS observed the minor children appeared "to be well nourished and cared for[.]"

On 10 November 2023, Respondent-Mother informed DSS that Respondent-Father had relapsed on cocaine and fentanyl.  On 11 December 2023, Respondent-Mother tested positive for marijuana and fentanyl.  The children were then placed with temporary safety providers through the end of December.

Respondent-Parents underwent several drug screens in the first months of 2024.  Respondent-Mother tested negative for all substances in January but positive for suboxone in March.  Respondent-Father self-reported relapsing on cocaine on 2

---

[1] Pseudonyms agreed upon by the parties.

January 2024, tested negative for all substances on 9 January 2024, tested positive for suboxone in March, and tested negative for all substances in April.

On 2 May 2024, Respondent-Parents entered into a case plan with DSS to address specific safety concerns surrounding Respondent-Parents' substance use and parenting skills. Respondent-Parents agreed to complete a substance abuse assessment, a parenting skills assessment, and to follow all treatment recommendations.

On 7 May 2024, DSS received a report Respondent-Father had driven while under the influence of fentanyl with Eric in the car. While investigating the report, Respondent-Mother admitted to DSS she had also relapsed two days prior while the children were alone in the home with her. Both parents expressed remorse to DSS. The children were again placed with a temporary safety provider.

On 10 May 2024, DSS received a report Respondent-Parents had fled in the middle of the night with the juveniles. DSS eventually located the family in Alabama.

On 15 May 2024, DSS filed petitions alleging Eric and Amanda were neglected and dependent juveniles. In the petitions, DSS raised concerns of substance abuse, lack of parenting skills, failure to protect the juveniles, and domestic violence. The trial court entered orders granting DSS nonsecure custody of the juveniles that same day.

The juveniles were adjudicated neglected and dependent on 11 July 2024 and placed in foster homes. Respondent-Parents were each granted an hour of supervised visitation with Eric once per week and two hours with Amanda bi-weekly.

On 4 March 2025, DSS filed a Petition to Terminate Respondent-Parents' Parental Rights in the juveniles. The Petition alleged that since the juveniles had entered DSS custody, Respondent-Parents had failed to adequately remedy the issues which led to the removal of the juveniles from the home. As to Respondent-Mother, DSS alleged she had not completed trauma therapy and, despite completing a parenting skills course, still failed to demonstrate appropriate parenting behaviors. Additionally, Respondent-Mother had relapsed multiple times, including an incident which led to her being charged with Driving While Impaired; attended only five of fourteen requested drug screens; and had allegedly allowed her abusive boyfriend to move into her home. As to Respondent-Father, DSS alleged he had not started his parenting course, had not completed his substance abuse or mental health counseling, had relapsed multiple times, and did not have stable housing or proof of employment.

Eric is diagnosed with Global Developmental Delay, Level 1 Autism Spectrum Disorder, Pervasive Developmental Disorder, and a genetic disorder requiring certain specialized medical care. Amanda is nonverbal and diagnosed with Global Developmental Delay, Level 3 Autism Spectrum Disorder, and behavioral insomnia. Both children generally require a heightened level of care. DSS expressed concerns

about Respondent-Parents using "baby talk" with the children; not using Amanda's assisted-speech device; and alleged both parents failed to challenge the children's behavior, leading to "regression" in the children's behavior during and after visits.

The Termination Hearing was conducted on 8 May 2025. Respondent-Parents each testified on their own behalf. Social Worker Rebecca Efird (SW Efird) and the children's Guardian ad litem (GAL) testified on behalf of DSS.

DSS also called Sergeant Angel Gonzalez of the Concord Police Department to testify about an incident which took place on the day of the hearing, where Respondent-Mother was allegedly seen taking, or with individuals who were taking, drugs. Sergeant Gonzalez testified he had seen Respondent-Mother holding the plunger to a syringe while sitting in a car outside the courthouse. He subsequently seized "a syringe without a cap on it with an exposed needle[,]" "a container with white powder residue inside of it[,]" "several plastic straws or plastic tubes to smoke fentanyl[,]" "[a]luminum foil that's burned from burning fentanyl[,]" and "a container that had a bunch of plastic pipes in it . . . to smoke fentanyl[ ]" from the vehicle.

In addition to testimony surrounding concerns around Respondent-Parents' parenting and substance use, DSS also elicited evidence of ongoing domestic violence between Respondent-Parents. Specifically, on 6 April 2025, Respondent-Parents were both arrested and charged with domestic violence against the other. After that incident, Respondent-Mother remained in contact with Respondent-Father despite a court order prohibiting it. SW Efird testified Respondent-Mother had not completed

a domestic violence treatment program at the time of the Termination Hearing, despite it being recommended to her on 22 January 2025.

On 4 June 2025, the trial court entered an Order terminating Respondent-Parents' parental rights in Eric and Amanda under N.C. Gen. Stat. § 7B-1111(a)(1), (a)(3), and (a)(6). Respondent-Parents timely filed Notices of Appeal.

## Issues

The issues on appeal are whether the trial court: (I) erred in concluding grounds existed to terminate Respondent-Mother's parental rights in the juveniles and (II) abused its discretion in concluding it was in the juveniles' best interests to terminate Respondent-Parents' parental rights in the juveniles.

## Analysis

"A proceeding to terminate parental rights is a two step process with an adjudicatory stage and a dispositional stage. A different standard of review applies to each stage." *In re D.R.B.*, 182 N.C. App. 733, 735, 643 S.E.2d 77, 79 (2007). At the adjudicatory stage, the burden of proving grounds for termination exist "shall be upon the petitioner or movant and all findings of fact shall be based on clear and convincing evidence." N.C. Gen. Stat. § 7B-1109(f) (2025). "The standard for appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether those findings of fact support its conclusions of law." *Id.* "If the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." *In*

*re S.C.R.*, 198 N.C. App. 525, 531, 679 S.E.2d 905, 909 (2009) (citation and quotation marks omitted). Unchallenged findings of fact are binding on review. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted). We review the trial court's conclusions of law de novo. *In re B.S.O.*, 234 N.C. App. 706, 708, 760 S.E.2d 59, 62 (2014) (citation omitted).

"If the petitioner meets its burden of proving at least one ground for termination of parental rights exists under N.C. Gen. Stat. § 7B-1111(a), the court proceeds to the dispositional phase and determines whether termination of parental rights is in the best interests of the child." *In re C.C.*, 173 N.C. App. 375, 380, 618 S.E.2d 813, 817 (2005). "The standard of review of the dispositional stage is whether the trial court abused its discretion in terminating parental rights." *Id.* at 380-81, 618 S.E.2d at 817 (citation omitted). "An abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (citation, quotation marks, and brackets omitted).

I.    Grounds for Termination

The trial court concluded grounds existed to terminate Respondent-Parents' parental rights in the minor children under N.C. Gen. Stat. § 7B-1111(a)(1), (a)(3), and (a)(6). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019) (citations omitted).

A trial court may terminate a parent's rights upon a finding the parent has neglected the juvenile. N.C. Gen. Stat. § 7B-1111(a)(1) (2025). "The juvenile shall be deemed to be . . . neglected if the court finds the juvenile to be . . . a neglected juvenile within the meaning of G.S. 7B-101." *Id.* A "neglected juvenile" is defined in pertinent part as a juvenile whose parent does not provide proper care, supervision, or discipline; or who creates or allows to be created a living environment injurious to the juvenile's welfare. *Id.* § 7B-101(15) (2025).

" 'To terminate parental rights based on neglect, if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent.' " *In re K.N.*, 378 N.C. 450, 457-58, 861 S.E.2d 847, 853 (2021) (quoting *In re D.L.A.D.*, 375 N.C. 565, 567, 849 S.E.2d 811, 814 (2020)) (internal quotation marks omitted). "In this situation, 'evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights,' but '[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect.' " *Id.* at 458, 861 S.E.2d at 853 (quoting *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984)). "Our case law clearly states that in determining whether future neglect is likely, the trial court must consider evidence of changed circumstances between the period of past neglect and the time of the termination hearing." *Id.* at 458, 861 S.E.2d at 854 (citing *In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020)).

At the outset, we address Respondent-Mother's challenges to the trial court's evidentiary Findings of Fact:[2]

> (37) [DSS] referred [Respondent-Mother] . . . for a psychological evaluation. [DSS] sent a referral for trauma therapy to Genesis on December 11, 2024. [Respondent-Mother] completed her evaluation on November 7, 2024 which recommended completing trauma therapy and to participate in substance recovery support groups. On January 8, 2024, [Respondent-Mother] did not attend her scheduled trauma therapy assessment with Genesis. [Respondent-Mother] rescheduled her assessment with Genesis for February 5, 2025 however did not attend this appointment. [Respondent-Mother] completed the initial evaluation and but [sic] needs to follow through on the recommendations.

> (38) [DSS referred Respondent-Mother for a parenting assessment]. [Respondent-Mother] completed her assessment on June 18, 2024 which recommended 12 weeks of parenting group. [Respondent-Mother] completed her 12 sessions as of October 30, 2024. [Respondent-Mother] provides food for the children, but does not cut up the food, provide utensils, or model that they should sit when eating. [Respondent-Mother] allows the children to drink coffee during visits. [Respondent-Mother] does not recognize [Eric's] growth in speech and uses "baby talk" when engaging with him. [Respondent-Mother] does not challenge her children's behavior which leads to regression in behaviors during visits. [Respondent-Mother] has made decisions that did not put the children first. . . . [Respondent-Mother] does not use [Amanda's] communication device during visits. [DSS] takes [the communication device] out of [Amanda's] backpack to put it in a visible area and [the] communication device is not used. [Respondent-Mother] is aware of [Amanda's] communication device as [Amanda] came into care with the communication device from [Respondent-Parents].

> . . . .

---

[2] Only Respondent-Mother challenges the trial court's determination grounds existed to terminate her parental rights in the minor children; thus, we address the trial court's adjudicatory Findings and Conclusions only as they pertain to Respondent-Mother.

(40) . . . [DSS] has requested numerous random drug screens. Out of 14 requests, [Respondent-Mother] has attended 5 drug screens. On September 26, 2024, October 1, 2024, and October 30, 2024, [Respondent-Mother] tested positive for suboxone. On December 2, 2024 [Respondent-Mother] tested positive for suboxone and methadone. On December 12, 2024, [Respondent-Mother] provided proof of her methadone prescription. She denied using methadone and suboxone together and did not give an explanation to [DSS] for her positive screen. On January 15, 2025 [Respondent-Mother] completed her screen and was positive for methadone. [Respondent-Mother] has not provided proof of her suboxone prescription. [Respondent-Mother] has only participated in 5 out of 27 drug screens. During the lunch break at today's hearing, law enforcement received a complaint about a man with a possible overdose and/or sleeping in the backseat of a car along with other frantic people located in white sedan in a parking lot. Upon law enforcement's arrival, [Respondent-Mother] was identified as one of the people in the white sedan. Law Enforcement then noted that [Respondent-Mother] was sitting in the passenger's seat with her fist balled up was a napkin enclosed in her fist and a plunder to a syringe in her hand. When asked to step out of the car and to show her hand, [Respondent-Mother] jerked away from Law Enforcement spilling a chocolate type of drink on her skirt. Located in the car with [Respondent-Mother] was a syringe with no cap, exposed needles, a white powder residue, tubes for smoking, plastic straws and burnt foil.

. . . .

(45) Visitation with [Respondent-Mother] is for one hour, once per week, supervised by [DSS] or a designee. [Respondent-Mother] is typically engaged with her children during visitations. [Respondent-Mother] brings drinks and snacks to each visit as well as clothes and shoes. However, [Respondent-Mother] has allowed the children to drink soda and coffee during visits. [DSS] has advised against providing coffee and soda as both children have dental concerns. [Respondent-Mother] still provided soda and coffee to the children stating she did not want to upset the children. . . . Furthermore, [Respondent-Mother] does not cut up the food, provide utensils, or consistently model that they should

- 10 -

sit when eating, resulting in the children getting food all over furniture and toys and running around with food in their mouths. [DSS] has observed [Respondent-Mother] to dump noodles onto outdoor tables and encouraged the children to eat with their hands. [Respondent-Mother] does not utilize [Amanda's] communication tablet which is necessary due to her being nonverbal. [Respondent-Mother] usually provides her phone for [Eric] to watch videos. During a typical visit, the children eat and then [Amanda] wanders around the room with limited interaction and engagement from parents, and [Eric] is provided a phone to watch videos on for the entirety of the visit. Due to the children's diagnoses of autism, the children require consistent expectations and routines. Due to [Respondent-Mother] not upholding consistent expectations, the children show regression in behaviors during and after visitations. On one occasion during the Christmas visit, [Respondent-Mother] was observed to be sending emails for work and talk to texting her coworkers for the last 30 minutes of the visit instead of spending quality time with her children. On 1/8/2025, [Respondent-Mother] did not attend visitation. When [DSS] asked about this, she stated she did not want to be judged for leaving detox at McLeod. [Respondent-Mother] continues to make decisions that do not put her children first. [Respondent-Mother] struggles with managing her children's disabilities. During one of [Respondent-Mother's] visits, [Amanda] was noted to be climbing on furniture and digging in the trash and [Respondent-Mother] lifted her hand in order to pop [Amanda] knowing [Amanda] does not respond well to [t]his type of discipline due to her disabilities. [Respondent-Mother] did not make contact and [DSS] discussed appropriate discipline.

. . . .

(49) [Respondent-Mother] has engaged in services, however needs to complete components of her case plan including completing trauma therapy and substance abuse recommendations. [Respondent-Mother] needs to comply with drug screens requests [sic] and continue to maintain housing and employment. [Respondent-Mother] needs to work on establishing stable transportation. [Respondent-Mother] needs to make decisions that put her children first. [Respondent-Mother] continues to

> struggle with her substance use and continues to test positive for illegal substances. [Respondent-Mother] continues to surround herself with people and situations that involves illegal substances even today.

As to Finding 37, Respondent-Mother argues she had completed three trauma therapy sessions at the time of the Termination Hearing. However, SW Efird's testimony was that Respondent-Mother had missed several of her trauma therapy appointments and had not yet completed trauma therapy, which was one of Respondent-Mother's clinical recommendations. Thus, this Finding is supported by competent evidence.

Respondent-Mother challenges the following portion of Finding 38: "[Respondent-Mother] does not use [Amanda's] communication device during visits. [DSS] takes the communication device out of [Amanda's] backpack to put it in a visible area and communication device is not used." SW Efird testified that Respondent-Mother does not use the communication device often with Amanda. The trial court also found, and the Record confirms, Respondent-Mother was aware of Amanda's communication device because the family had it before Amanda came into DSS custody. This evidence is competent to support the trial court's Finding.

Respondent-Mother challenges the portion of Finding 40 which states she had not provided "proof of her suboxone prescription."[3] DSS concedes this portion of the

---

[3] Suboxone contains buprenorphine, a Schedule III controlled substance, N.C. Gen. Stat. § 90-91(d)(9) (2025), possession of which is punishable under N.C. Gen. Stat. § 90-95(a)(3). A person may

Finding is not supported by the evidence. Accordingly, we will disregard it in our review of the trial court's Conclusions.

Respondent-Mother challenges the portion of Finding 45 which states: "Due to [Respondent-Mother] not upholding consistent expectations, the children show regression in behaviors during and after visitations." The Record shows SW Efird testified Amanda needs "stability and structure. So any time we change her schedule, so if we have to make up a visit because one of the parents is out and we have a longer visit, there are more self-injurious behaviors." Additionally, she testified Respondent-Parents have not encouraged the children's independence and self-reliance or behavioral management such as setting boundaries and teaching discipline. This Finding is supported by competent evidence.

As to Finding 49, Respondent-Mother argues there is no evidence she continues to struggle with substance use, test positive for substances, or surround herself with people and situations involving substances. The Record shows Respondent-Mother has tested positive for both suboxone and methadone and, according to Sergeant Gonzalez's testimony, was seen with several other individuals in a car filled with drug paraphernalia on the day of the Termination Hearing. Respondent-Mother's challenge is without merit.

---

be authorized to possess said substance without the risk of prosecution if, for instance, the substance is medically prescribed. *See State v. McNeil*, 47 N.C. App. 30, 38, 266 S.E.2d 824, 829 (citations omitted), *disc. review denied and appeal dismissed*, 301 N.C. 102, 273 S.E.2d 306 (1980), *cert. denied*, 450 U.S. 915, 101 S. Ct. 1356, 67 L. Ed. 2d 339 (1981).

Lastly, Respondent-Mother challenges the trial court's "ultimate" Findings of Fact which form the basis for the neglect adjudication under N.C. Gen. Stat. § 7B-1111(a)(1).[4]   Ultimate findings must be supported by the trial court's other evidentiary findings.  *In re G.C.*, 384 N.C. 62, 65 n.3, 884 S.E.2d 658, 661 n.3 (2023) ("[A]n ultimate finding is a finding supported by other evidentiary facts reached by natural reasoning.").  The challenged ultimate Findings are as follows:

> (35) Since [the juveniles were adjudicated neglected and dependent], the Court has consistently reviewed [Respondent-Parents'] progress towards the case plan and the parents' efforts to alleviate or remedy the issues which led to the removal of the juveniles from the home.  [Respondent-Parents] have not made reasonable and adequate efforts towards the case plan to ensure the safety of the children.  There is a high probability of repetition of neglect and dependency of the children if the children were returned to [Respondent-Parents'] custody based upon the lack of commitment towards working on the case plan.  The concerns at the time of removal are still a concern, and there have not been any sustained behavior changes shown by the mother and father of the juveniles.
>
> . . . .
>
> (63) [Respondent-Parents] have not acted consistent with their constitutional protected status as a parent.  The juveniles were born to [Respondent-Parents], and they have not provided support or consistent care with respect to the children.  [Respondent-Parents] have not actively cooperated with the plan, [DSS] and the GAL.  [Respondent-Parents] have not acted in a

---

[4] Respondent-Mother also challenges Finding 68.  Because this Finding is related to grounds for termination under subsection (a)(6) and does not bear on our analysis, we do not address it.  *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58-59 (2019) ("[W]e review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982))).  Respondent-Mother's challenge to the dispositional Findings are addressed below under Issue II.

manner that is consistent with the juvenile's [sic] health and safety.

. . . .

(67) [Respondent-Parents] have not made adequate progress under a plan within a reasonable period of time. [Respondent-Parents] have not actively participated in or cooperated with a plan, [DSS] and the GAL. [Respondent-Parents] have remained available to the court, [DSS] and the GAL. [Respondent-Parents] have not acted in a manner that is consistent with the juveniles' health and safety.

. . . .

(69) [Respondent-Parents] have not remedied any of the conditions that led to the juveniles' removal. [Respondent-Parents] have not shown any behavior changes, or the ability to care for the juveniles' health, safety, and welfare. The concerns of what brought the children in [DSS] care are still an issue as of today.

(70) [Respondent-Parents] have abdicated her [sic] parental responsibilities and have not acted in a manner consistent with their constitutionally protected status as parents.

. . . .

(72) There is a high probability of repetition of neglect of the juveniles, if the juveniles were returned to [Respondent-Parents'] custody based upon their lack of commitment towards working on the case plan and that it is likely any incapability will continue for the foreseeable future. The concerns at the time of removal are still a concern.

(73) [Respondent-Parents] have allowed the juveniles to be neglected in the past and there is repetition of this neglect due to [Respondent-Parents] showing the same conduct that brought the juveniles into care and there is a possible [repetition] of that neglect based on their current behaviors. [Respondent-Father] acknowledges his use of substances and has continued to relapse

despite going to detox facilities[.] [Respondent-Parents] have continued to have positive drug screens throughout this case and have not complied with all the requested drug screens. There is also no evidence that was presented to the Court that they are able to care for the juveniles, that they have addressed their domestic violence issues, their substance abuse issues, and despite being ordered to remain away from one another, they did not, which is violation of a Court's order [sic]. It is concerning to the Court that despite having those criminal charges and being incarcerated, [Respondent-Parents] continue to be around and use illegal substances and there is no evidence that the domestic violence has stopped between [Respondent-Parents].

As to each of these Findings, Respondent-Mother's argument is essentially that the evidence of her behavior at the time of the Termination Hearing does not support Findings she was acting inconsistently with the children's health and safety or that she had not remedied the issues which led to the juveniles being removed from the home.

We acknowledge there was evidence Respondent-Mother had completed parenting classes, engaged in substance abuse treatment, and begun trauma therapy. However, the fact that Respondent-Mother has made positive efforts does not indicate she has not also engaged, and continues to engage, in conduct inconsistent with her protected status and indicative of a likelihood of future neglect. *See In re J.M.*, 271 N.C. App. 186, 193-94, 843 S.E.2d 668, 674 (2020). As explained above, there was evidence that, despite her advancements, Respondent-Mother continued to struggle with substance abuse, had failed to remove herself from situations involving illegal substances, had not completed a domestic violence treatment program, and continued

to demonstrate troubling parenting behaviors at her visits with the juveniles. This evidence is competent to support the trial court's Findings that Respondent-Mother had not made adequate progress on her case plan, had neglected the juveniles, and that a likelihood of the repetition of said neglect still existed—notwithstanding any evidence to the contrary. *In re S.C.R.*, 198 N.C. App. at 531, 679 S.E.2d at 909 (citation omitted).

Moreover, the trial court's Findings reflect a consideration of the evidence of changed circumstances and Respondent-Mother's progress leading up to the Termination Hearing. *In re K.N.*, 378 N.C. at 458, 861 S.E.2d at 854 (citation omitted). Thus, the Findings support the trial court's Conclusion there was a substantial risk of harm or impairment to the juveniles and a likelihood of future neglect should they be returned to Respondent-Mother's care. Therefore, the Findings support the trial court's Conclusion grounds existed to terminate Respondent-Mother's parental rights in the juveniles under N.C. Gen. Stat. § 7B-1111(a)(1). Consequently, the trial court did not err in concluding grounds existed to terminate Respondent-Mother's parental rights in the juveniles under N.C. Gen. Stat. § 7B-1111(a)(1).[5]

II.    Best Interests Determination

---

[5] Because we affirm the trial court's Conclusion grounds existed to terminate Respondent-Mother's parental rights under subsection (a)(1), we need not address whether the trial court properly determined such grounds existed under subsections (a)(3) or (a)(6). *In re E.H.P.*, 372 N.C. at 395, 831 S.E.2d at 53 (citations omitted).

"After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a) (2025). The trial court must consider the following criteria and make written findings regarding those that are relevant:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

*Id.* "[T]he language of [N.C. Gen. Stat. § 7B-1110(a)] requires the trial court to 'consider' all six of the listed factors[ ]"; however, "the court must enter written findings in its order concerning only those factors that are relevant." *In re D.H.*, 232 N.C. App. 217, 220-21, 753 S.E.2d 732, 735 (2014) (citations and quotation marks omitted). " 'The trial court's dispositional findings are binding . . . if they are supported by any competent evidence' or if not specifically contested on appeal." *In re B.E.*, 375 N.C. 730, 745, 851 S.E.2d 307, 317 (2020) (alterations in original) (quoting *In re E.F.*, 375 N.C. 88, 91, 846 S.E.2d 630, 632 (2020)).

Respondent-Mother argues the trial court abused its discretion in concluding it was in the juveniles' best interests to terminate her parental rights because the trial court allegedly did not engage in a "reasoned analysis" of the factors listed in Section 7B-1110(a). Similarly, Respondent-Father contends the trial court did not conduct an adequate best interests inquiry, "separate and apart from whether termination grounds exist." Additionally, Respondent-Father contends terminating his parental rights was not in Amanda's best interest because she was not in a pre-adoptive placement.[6]

As to the latter assertion, our Supreme Court addressed a similar argument in *In re S.M.*, 380 N.C. 788, 869 S.E.2d 716 (2022). There, the respondent-parents argued the trial court abused its discretion in determining termination of their parental rights was in the minor child's best interest because there was no plan for her adoption and the decision would allegedly turn her " 'into a legal orphan[.]' " *Id.* at 806, 869 S.E.2d at 731. Our Supreme Court disagreed, noting that although the juvenile "had been in multiple placements due to her behavior," she had shown improvement in her current foster home; the respondent-parents had made no progress towards correcting the conditions which had led to the juvenile's removal from their home; and the juvenile's relationship with the respondent-parents

---

[6] Respondent-Father does not raise this argument as to Eric's best interest.

negatively affected her development, rather than providing a stabilizing influence. *Id.*

In the instant case, Amanda had been in her current placement for approximately nine months at the time of the Termination Hearing, and the GAL testified Amanda and her foster mother have "an amazing bond." Additionally, the GAL Court Report suggests there is a path towards Amanda's adoption:

> [Amanda's] likelihood of adoption would significantly increase if her current foster parent had access to the proper resources to support her needs. Although the foster mother is uncertain about adoption at this time, *she clearly demonstrates love and commitment to [Amanda].* Despite [Amanda] being nonverbal and diagnosed with autism, *it is evident that she is bonded with her foster mother*, who is able to soothe her during episodes of dysregulation. [DSS] is working to secure the supports necessary to help maintain this placement and *possibly move toward adoption.*

(emphasis added). Further, the trial court found the placement is stable, Amanda is doing well in the placement, and her self-injurious behaviors had subsided since moving into this placement. And as in *S.M.*, the evidence here tends to suggest Respondent-Parents' relationship with the juvenile negatively affects Amanda's development, rather than promotes it. *See id.* Thus, Respondent-Father's assertions that "there is no indication that [the] placement wants to adopt Amanda or provide long-term care into the future[ ]" are without merit.

At the hearing, the children's GAL also testified as to her opinion that termination would be in the children's best interests:

[Counsel]: And the Court is going to be evaluating whether it is in the best interest for these children to be eligible for adoption. Can you tell the Court what the relationship is between [Amanda] and her foster parent?

[GAL]: [Amanda] and her foster parent has [sic] an amazing bond. Even though I've sensed that the foster mom may be a little tired, she still cares and loves for [Amanda]. She advocates well for her. She's not scared to voice her opinion when she needs something or her concerns that she needs something as well.

[Counsel]: What about [Eric] and his foster parent?

[GAL]: Eric and his foster mom has [sic] a great bond as well. When I went to a visit, he called her mom, and I don't think I've ever heard him say that before because he's usually always playing, but he called her mom, and I just thought that was a big step for him.

[Counsel]: And do you think that the termination of parental rights would assist in providing permanence for these two children?

[GAL]: I do.

[Counsel]: Why do you say that?

[GAL]: Because they need a stable and reliable environment. With their medical and developmental needs they need parents that's going to show up for them and that's going to be reliable for them.

Based on the evidence, the trial court found:

(75) [Eric] is 8 years old and is doing well in his placement. Terminating the parental rights of the mother and father would aid in the accomplishment of the permanent plan of adoption for [Eric]. [Eric] is currently placed with a licensed foster parent since May 15, 2024. The placement is stable, and continuation of the placement is in the juvenile's best interests. [Eric] is doing well in the home. He enjoys playing with the other children in

- 21 -

the home and has bonded closely with them. [Eric] has enjoyed spending time at a trampoline park during summer camp and has been doing very well in school . . . . The placement is stable, and continuation of the placement is in the juvenile's best interests. . . . There is a minimal bond between the juvenile, [Respondent-Father] and [Respondent-Mother].

(76) . . . The foster parent ensures that [Eric's] needs are being met, addressed and does well in managing those needs for [Eric]. Since [Eric] has been placed with his foster parents, his behaviors and disabilities have improved and [Eric] can now advance to higher classes.

. . . .

(82) [Amanda] is 7 years old and is doing well in her placement. Terminating the parental rights of the mother and father would aid in the accomplishment of the permanent plan of adoption for [Amanda].

(83) [Amanda] is currently placed with a licensed foster parent since July 29, 2024. The placement is stable, and continuation of the placement is in the juvenile's best interests. [Amanda] is doing well in the home and has gotten along with the other children in the home. [Amanda] is practicing using her communication device and is now using two-to-three-word sentences with her device. [Amanda's] self-injurious behaviors have subsided. [Amanda] has been attending school . . . and receiving services through her IEP. The placement is stable, and continuation of the placement is in the juvenile's best interests. . . . The foster parent ensures that [Amanda's] needs are being met, addressed and does well in managing those needs for [Amanda]. There is a minimal bond between the juvenile, [Respondent-Father] and [Respondent-Mother].

. . . .

(88) Return of the juveniles to the custody of [Respondent-Parents] would be contrary to the welfare and best interest of the juveniles.

Respondent-Parents both challenge the trial court's ultimate Finding that returning the juveniles to their care would not be in the juveniles' best interests. Additionally, Respondent-Father challenges Finding 83, contending the evidence shows Amanda was unable to receive needed services to treat her autism in foster care, continued to engage in self-injurious behaviors, and the current foster placement was not committed to Amanda's care long-term.[7] But as discussed above, the GAL Court Report contravenes those assertions. Although she was not able to receive all the recommended services, the Record evidence shows Amanda was receiving those which were available, including services through her individualized education program; her self-injurious behaviors had decreased; and there was a potential path to adoption with Amanda's current foster parent.[8] Moreover, the Record shows Amanda was not receiving certain services because there was a lack of providers or there were scheduling conflicts; there is no evidence the foster parent was at fault for Amanda not receiving these services and no evidence Amanda would be more likely to receive these services in Respondent-Father's care.

---

[7] Respondent-Father also challenges Findings 52, 58-59, 62-63, and 66-74; however, because our present determination does not turn on any of those Findings, we do not address them in additional detail. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58-59 (citation omitted).

[8] To be clear, Finding 83 does not directly state the foster parent is committed to Amanda's long-term care. Rather, the trial court found the placement is "stable" and remaining there is in the juvenile's best interest. Thus, to the extent Respondent-Father argues Finding 83 is unsupported because the current foster placement "was not committed to Amanda's care long-term[,]" it is irrelevant to our review because it is not actually part of the trial court's Finding. But in any event, the Record evidence undermines Respondent-Father's argument.

"To the extent respondents ask this Court to undertake our own assessment of the record evidence and to substitute our weighing of the relevant statutory criteria for that of the trial court, we decline to do so." *In re S.M.*, 380 N.C. at 806, 869 S.E.2d at 731. " '[S]uch an approach would be inconsistent with the applicable standard of review, which focuses upon whether the trial court's dispositional decision constitutes an abuse of discretion rather than upon the manner in which the reviewing court would weigh the evidence were it the finder of fact.' " *Id.* at 806-07, 869 S.E.2d at 731 (quoting *In re I.N.C.*, 374 N.C. 542, 551, 843 S.E.2d 214, 220 (2020)).

Contrary to Respondent-Parents' assertions, the trial court's dispositional Findings of Fact "demonstrate that it considered the dispositional factors set forth in N.C.G.S. § 7B-1110(a) and 'performed a reasoned analysis weighing those factors.' " *Id.* at 807, 869 S.E.2d at 731 (quoting *In re Z.A.M.*, 374 N.C. at 101, 839 S.E.2d at 801). The trial court's Findings, in turn, support its Conclusion it was in the juveniles' best interests to terminate Respondent-Parents' parental rights. Therefore, the trial court did not abuse its discretion in concluding it was in the juveniles' best interests to terminate Respondent-Parents' parental rights.

## Conclusion

Accordingly, for the foregoing reasons, we affirm the trial court's Order terminating Respondent-Parents' parental rights in Eric and Amanda.

AFFIRMED.

Judges ARROWOOD and FLOOD concur.

Report per Rule 30(e).